# Richmond.

## ADAMS V. TRI-CITY AMUSEMENT COMPANY, INC.

### March 13, 1919.

1. WORKING CONTRACTS—*Fall of Walls—Liability of Contractor.*—The walls of a building, which was being erected pursuant to a written contract, fell, and it appeared from the evidence of the architect, who, under the plain terms of the contract, was the agent of the company (the landowner), to direct the work in its details, that although he was at first of the opinion that the falling of the walls was due to the fault of the contractor, he changed his opinion and in accordance with the agreement of the parties directed the re-erection of the walls at the joint expense of the company and the contractor. It was plain that the design of the wall was inadequate, by reason of the low, wet character of the ground, and for such a defect a building contractor could not be held responsible, for it is his duty to follow the plans and specifications furnished as his guide by the architect.

2. WORKING CONTRACTS—*Falling Walls — Agreement for Reconstruction.*—Where through the faulty design of the architect a wall fell, it was claimed by the landowner that because the contract was for the erection of the complete building, the loss arising from such an accident should fall upon the contractor. But in the instant case, where the loss was caused, not by any fault of the contractor, but because of the defective plans of the architect, the walls having been re-erected by the direction of the architect, a settlement and agreement imposing half the cost upon the contractor and half upon the owner cannot be said to be inequitable. This adjustment of an unanticipated difficulty, in which the interests of the owner required some prompt adjustment is further supported by the testimony of the architect and the contractor to the effect that the president, general manager and directors of the owner were informed of and agreed to this division of the expense of such re-erection.

3. WORKING CONTRACTS—*Agent of Landowner—Authority of General Manager of Company.*—A company which had entered into a contract for the erection of a building is chargeable

60

with notice of a letter written by its general manager to the contractor authorizing certain extra work and providing for payment of the same, especially in consideration of the fact that the general manager was the original promoter of the company; that the plans and contract for the building were originally made in his name; that he ordered many extras during the construction of the work; and that he did all these things with the knowledge of the president and directors.

4. WORKING CONTRACTS—*Arbitration and Award—Withdrawal from Arbitration.*—A working contract provided for arbitration in case of disputes. Pursuant to this agreement, three building experts were chosen as arbitrators, and when they met the arbitrator chosen by the landowner, by its direction, withdrew. The other arbitrators proceeded with their investigation and awarded the contractor the full amount of his claim. The two arbitrators who made the award were examined as witnesses in the case, and a close scrutiny of their testimony failed to indicate the slightest bias or prejudice against the landowner.

*Held:* That the record disclosed no sufficient justification for the withdrawal by the landowner from the arbitration.

5. WORKING CONTRACTS—*Implied Contract—Reconstruction.*—When walls fell through a defect in the architect's plans and there was no defect in the construction for which the contractor was responsible, the contractor is fairly entitled to recover the value of additional work done for the benefit and advantage of the landowner, and accepted and utilized by the landowner, even without an express contract for such additional work.

6. WORKING CONTRACTS—*Failure of Contractor to Perform.*—Where under the working contract the basement walls were to be water-proofed, and because of the sudden caving in of the earth against the wall, without fault of the contractor, this was not done, and there were leaks in the roof and some other defects.

*Held:* That in a suit to foreclose contractor's mechanic's lien, an allowance will be made for such defects and for the water-proofing of the basement walls.

7. JURISDICTION—*Mechanics' Liens—Receiver.*—In a suit to foreclose a mechanics lien against a corporate owner in the Circuit Court of the city of Hopewell, the trial court, after determining the amount due, decreed that instead of enforcing the lien by further proceedings in the case, the complainant should intervene by petition in a suit then pending in the Corporation Court of the city of Hopewell, in which a receiver had been appointed who at that time held the property of the company. If the suit in the Corporation Court of the city of

Hopewell was instituted before this suit, then there was no error in requiring the contractor to intervene by petition in that suit; but if this suit was first instituted, the Circuit Court of the city of Hopewell should proceed with this case and give the contractor complete relief by the enforcement of his lien against the property of the company; or for greater convenience one of the causes should be removed to the other court and both thereafter heard together.

Appeal from a decree of the Circuit Court of city of Hopewell, in a suit to enforce a mechanic's lien. From a decree producing amount of complainant's claim, complainant appeals.

*Amended and remanded.*

The opinion states the case.

*Don P. Halsey* and *A. B. Dickenson,* for the appellant.

*J. O. Heflin* and *A. L. Jones,* for the appellee.

PRENTIS, J., delivered the opinion of the court.

C. E. Adams (hereinafter called the contractor) erected a theatre building in the city of Hopewell for the Tri-City Amusement Company, Inc. (hereinafter called the company). After the completion of the structure the defendant filed his mechanic's lien, claiming that there was a balance ·due him of $5,893, and thereafter instituted this suit to enforce such lien.

The history of the transaction appears to be, that the original contract in writing was entered into on February 2, 1916, and provided for the erection of a building at the price of $7,335; thereafter the company authorized the contractor to build a basement as an addition to the building for $4,407, and certain extra work was directed. The decree of the court which is complained of reduced the claim of the contractor to the sum of $1,977.60 and of this reduction the contractor is here complaining.

[1] The controversy grows out of the fact that the basement walls of the building twice fell and had to be re-erected. The balance claimed by the contractor is for the extra work imposed upon him in the re-erection of these walls. When the walls fell the first time, they were reconstructed in accordance with the original plans and specifications of the architect, except that by the architect's instructions they were braced with iron columns. It is claimed for the company that the contractor rebuilt these walls without complaint, and at his own expense, and that his claim now for compensation for one-half of the cost of such re-erection is an afterthought. Upon this, as upon most of the controverted questions, there is a hopeless conflict in the testimony. It appears, however, from the evidence of the architect, who must, under the plain terms of the written contract, be held to be the agent of the company, to direct the work in its details, that he, although at first of the opinion that the falling of the walls was due to the fault of the contractor, upon learning the facts (the principal fact in this connection being that the company had failed to furnish the timbers which were necessary for the superstructure and for bracing the work) changed his opinion and in accordance with the agreement of the parties directed the re-erection of the walls at a joint expense of the company and the contractor. It is perfectly manifest that the design of this wall was inadequate. Whether sufficient or not, under ordinary conditions, it appears that by reason of the low, wet character of the ground and the consequent drainage through it, such a wall as the architect designed was not sufficient to stand the strain of the water and the earth which was washed against it. For such a defect a building contractor cannot be held responsible, for it is his duty to follow the plans and specifications furnished as his guide by the architect as the agent of the owner.

[2] The theory of the company, that because of the con-

tract for the erection of a complete building, the loss aris-
ing from such an accident should fall upon the contractor,
is unsound, in cases like this where the loss was caused, not
by any fault of the contractor, but because of the defective
plans of the architect, so that the walls having been re-
erected by the direction of the architect, the settlement and
agreement made under these circumstances of imposing half
the cost upon the contractor and half upon the company
cannot be said to be inequitable, and this adjustment of an
unanticipated difficulty, in which the interest of the com-
pany required some prompt adjustment is supported by the
testimony of the architect and the contractor to the effect
that the president, general manager and directors of the
company were informed of and agreed to this division of
the expense of such re-erection.

The walls, however, fell a second time, after the frame
superstructure had been erected, and the larger part of the
amount here in controversy grows out of the claim of the
contractor for the additional cost of erecting these walls
the third time. For the contractor it is shown that he had
strictly followed the plans and instructions of the archi-
tect; that after the accident there was a meeting of the di-
rectors; and that at that meeting he told them that he could
build a wall which would stand in that place, but that it
would be necessary to make it three feet wide at the bot-
tom, instead of eighteen inches, as the architect had plan-
ned, and that it should be gradually narrowed to the width
of eighteen inches at the top; that he estimated the cost of
the additional labor and material which would be required
to make this change at from $1,200 to $1,600, and that he
would undertake to do the work, which involved the removal
of a large quantity of earth and the cleaning off of bricks
of the old wall, as well as the additional material and la-
bor, at its actual cost plus ten per cent. thereon; and that
this was agreed to. In a short while he asked for some

written memorandum of this agreement, and said that he was otherwise unwilling to do the work. Thereupon Mr. Kippas, who was named as general manager in the charter of the company and had never been removed from office, gave him this letter:

"Hopewell, Va., August 21st, 1916.

"Mr. C. E. Adams,

Hopewell, Va.

"Dear Sir:

"You are hereby authorized to proceed with the following work as extra work at the Marcelle Building in Hopewell, Va.

"Re-erect the walls that caved in and take down walls that are not safe, at actual cost and 10 per cent. commission.

"Order Frames for the Theatre as per sketch furnished you same not cost more than $75.00 (5 frames in all).

"Order Electric Fixtures for Theatre as selected by me, same not to cost over $300.00 (10 *Brakets*, 5 Auditorium Celling Lights & 6 Lobby Lights, 4 Exit Lights.)

"Wire Building for six intercommunicating phones.

"Wire sidewalk for two street lights.

"The above electric fixtures are to be baught for us at cost price anad same is being done for us by you as an accommodation.

"Yours truly,

"TRI-CITY AMUSEMENT COMPANY, INC.,

"S. A. KIPPAS, Gnl. Mgr."

He thereupon proceeded with the work, relying upon the assurance of that letter that he would receive the actual cost of such re-erection with ten per cent. commission thereon added. This letter was promptly shown to Saunders, the treasurer of the company, and according to Kippas it was in substance authorized and directed by all of the other

directors. There is no conflict about the fact that it was shown to Saunders, but all of the other directors testified that they knew nothing whatever about the letter and denied that there was any agreement for the erection of the walls at cost plus ten per cent. Their version of the transaction is that the contractor agreed to re-erect these walls for a sum not exceeding $1,600; but there is striking confirmation of the contractor's understanding in the fact that each one of the witnesses says that the estimate of $1,600 was stated to be for the additional material and works made necessary by the change in design and the widening of the walls.

[3] In considering such testimony, the equities of the situation naturally influence the impartial mind. In this case the contractor would have been justified in refusing to re-erect the walls which had fallen because of defects in design (for which the company and its agent, the architect, were responsible) and not for defects in construction (for which he would have been responsible). There was no reason for expecting the contractor to incur the expense of such re-erection. Then, in considering the weight of the testimony, we find that Kippas was the original promoter of the company; that the plans and contract for the building were originally made in his name, he having originally secured the architect to make such plans, and the written contract was altered just before it was executed by the insertion of the name of the company; that Kippas was the general manager; that he ordered many extras during the construction of the work, some of which appear in the letter above quoted; that he countersigned the checks which were drawn by the treasurer in favor of the contractor as the work progressed; and that he did all these things with the knowledge of the president and directors from which their acquiescence must be inferred; and that they have accepted the benefit of his labors and attention to the business of the company, during the construction.

Upon the whole case, we are clear that the weight of the testimony sustains the contractor's claim, and that notwithstanding the denials of the other directors (whose veracity may be conceded) the corporation must be charged with notice of the letter referred to, written by Kippas, the general manager, and communicated to Saunders, its treasurer, and this whether the other directors knew of it or not; for it appears that Kippas was in the habit of giving orders, that the affairs of the company were conducted in a loose and unbusinesslike way, and that no record of either stockholders' or directors' meetings, or of any formal action taken by the company at any time, appears to have been kept by anybody.

[4] Then, again, there is another phase of the controversy, which though merely persuasive, tends to sustain the contractor's claim. In the original agreement it was provided that, "should any dispute arise respecting the true value of any such works added or omitted by the contractor, the same shall be arbitrated by appealing to three men who have been mutually selected, and whose decision shall be final and binding on all parties." Pursuant to this agreement, three building experts were chosen as arbitrators. They met for the purpose of arbitrating the controversy on the 18th of January, 1917. At the request of the company, through its president, Mr. Temple, who said that an important witness was absent, they adjourned to a date apparently agreeable to all, January 23, the order of adjournment being signed by all three of the arbitrators. When they met pursuant to such adjournment, the arbitrator chosen by the company, by its direction, withdrew; whereupon the other two arbitrators proceeded with their investigation and awarded the contractor the full amount of his claim. This award was based entirely upon the evidence of the contractor himself. No sufficient justification or excuse for this refusal by the company to observe their agree-

ment to submit to arbitration is shown by the record. The president, Mr. Temple, says: "I got information which I did not like, showing which way things were going, and as I afterward found out was correct from the witnesses herein. All those that attempted to arbitrate were in Mr. Adams' side just as I had been told they were; therefore, I declined to arbitrate." And later he says, in explaning why he refused to submit the evidence to the arbitrators: "After I found out how things were, we quit, and I did not propose to arbitrate," and that he did not feel bound by the arbitration and "did not pay any attention to it at all." In response to a question as to whether he meant to say that any of the arbitrators would have acted unfairly, he replied: "No, sir; I mean to say that they were lined up for the arbitration just as they are lined up here in those depositions, as witnesses for the plaintiff." Now, the two arbitrators who made the award were examined as witnesses in the case, and a close scrutiny of their testimony fails to indicate the slightest bias or prejudice against the company or against its claim. They were experts especially well fitted to determine such a controversy and there is not the slightest suggestion in the record above quoted that they are not honest men of high character, who wished to do the work which they were requested to do with the determination to do justice. So that, so far as this record discloses, the withdrawal by the company from the arbitration was without justification or excuse.

[5] There is still another view which may be taken of the case. It sufficiently appearing that the cause of the trouble was the defect in the plans at that particular place, because the character of the soil and drainage, and that there was no defect in the construction for which the contractor was responsible, and the additional work having been done for the benefit and advantage of the company, and having been accepted and utilized, even without an ex-

61

press contract the contractor is fairly entitled to recover the value of the work so performed. The losses of the stockholders of the company have been serious, but the contractor cannot be held responsible therefor.

[6] From every aspect of the case then, we are convinced that the trial court erred in failing to sustain the claim of the contractor, substantially for the amount claimed.

It appears, however, that under one of the contracts the basement walls were to be water-proofed, and that because of the sudden caving in of the earth against the wall this was not done. There is also testimony tending to show that there were leaks in the roof and some other defects, though the building has been accepted and is in use by the company. For these defects there should be an allowance in favor of the company, and in our opinion this allowance should be $500.

The decree will, therefore, be amended, and the amount adjudged to be due the contractor increased from $1,977.60 to the sum of $5,393, with interest thereon from the 13th day of January, 1917, and costs.

[7] It appears that the trial court, after determining the amount due, decreed that instead of enforcing the lien by further proceedings in the cause, the complainant should intervene by petition in a suit thtn pending in the Corporation Court of the city of Hopewell, in which a receiver had been appointed who at that time held the property of the company. If the suit in the Corporation Court of the city of Hopewell was instituted before this suit, then there is no error in requiring the contractor to intervene by petition in that suit; but if this suit was first instituted, the Circuit Court of the city of Hopewell should proceed with this case and give the contractor complete relief by the en-

forcement of his lien against the property of the company; or for greater convenience one of the causes should be removed to the other court and both thereafter heard together.

The cause will be remanded for such further proceedings as may be necessary to effectuate the views herein expressed.

*Amended and remanded.*