**BLUE BELL, INCORPORATED,**
**Plaintiff,**

v.

**John CASSIDY, doing business as John Cassidy Construction Company,**
**Defendant.**

**No. E–C–52–60.**

United States District Court
N. D. Mississippi, E. D.

Dec. 20, 1961.

Mitchell, McNutt & Bush, Tupelo, Miss., for plaintiff.

Hugh N. Clayton, New Albany, Miss., Rosenfield, Borod, Fones & Bogatin, Memphis, Tenn., for defendant.

CLAYTON, District Judge.

This is an action to recover damages resulting from the collapse of a portion of a building on February 15, 1958, near Tupelo, Mississippi. Plaintiff, Blue Bell, Incorporated, bottomed its claim on the alleged negligence of defendant, John Cassidy, doing business as John Cassidy Construction Company, in failing to adequately protect his work. The case was tried to the Court without a jury and is now for disposition on briefs.

The building about which this controversy arose is an industrial type building with tilted concrete walls, concrete floors and a light concrete roof which was constructed by defendant under a contract with the plaintiff. This contract consists of the Standard A. I. A. Form A-1 issued by the American Institute of Architects, printed "General Conditions" published by the American Institute of Architects, and the plans and specifications prepared by architects employed by plaintiff and by engineers employed by the architects with the approval of plaintiff. Defendant contractor was to supply all materials and labor necessary for the completed building with the exception of the structural steel work, certain electrical work, painting, conveyor systems, well and water tank, and balcony grating, which were to be provided by other contractors or by plaintiff. For this he was to receive a fixed contract price.

The architects had general supervision and direction of the work and were required to furnish with reasonable promptness any additional instructions that were necessary for the proper execution of the work. It was also the responsibility of the architects to make decisions on all matters relating to the execution and progress of the work. Defendant was relieved of responsibility for damages to the work *due to causes beyond his control or without fault or negligence on his part.*

No extra work could be done or change made, except in an emergency endangering life or property, unless in pursuance of a written order from the owner signed or countersigned by the architects or a written order from the architects stating that the owner had authorized the extra work or change.

The foundations for this building were to be piles of the bored pedestal type with belled bottoms and changes in depth of piles or sizes of bells could be ordered by the architects if a revision of the foundation was required because of soil conditions encountered. When work on foundations began, one of the engineers was present and soil conditions were encountered which required a change in the design of the piles. Under the direction of the architects and engineers, friction-type piles were substituted.

In the latter part of 1957, defendant's superintendent noticed some bowing in the structural steel and reported this

fact to the engineers, but nothing was done about this by the engineers or architects.

Work continued until January 7, 1958, at which time there remained only the finishing work to be done. On that day it was discovered by defendant that certain columns supporting the structural steel beams had settled or sunk into the ground which caused excessive water to pond or stand on the roof. The architects and engineers were notified and the following day one of the architects and one of the engineers visited the job site for the purpose of making an inspection. They were accompanied on this inspection by defendant's superintendent.

There was a sharp conflict in the evidence concerning instructions given to defendant's superintendent on the job on this occasion. Plaintiff claims that the superintendent was instructed to shore up two of the columns. Defendant's evidence, which is more persuasive, is to the contrary. He contends that the superintendent was instructed at this time to take readings as to the settlement of all columns and it is undisputed that readings were taken shortly after the meeting on January 8, which showed that five columns had settled more than 2½ inches. The two columns about which the controversy exists had settled more than the others. However, this dispute is inconsequential since these two columns were shored up on the night of January 15 and the eventual collapse of a portion of the roof was in no wise caused by these columns being shored on January 15 rather than on January 8.

Plaintiff also strongly contends that at the January 8 meeting the engineer directed the superintendent on the job to shore up any column that settled more than 2½ inches. This is sharply contradicted by defendant's witnesses, and their version is supported by other circumstances as will be seen. The evidence is in conflict as to the amount of settling of columns after January 8, but the first reading taken on January 8 showed that at least five columns had settled more than 2½ inches, and plaintiff does not claim that the superintendent was expressly instructed on January 8, or at any other time, to shore up all five of these columns. Additionally, it is significant to note that on January 14, one of plaintiff's engineers and one of plaintiff's architects visited this job site with the Dean of the School of Engineering of the University of Mississippi to obtain his advice about what should be done. During this visit defendant was directed to make a load test on one or two of the columns, and, there is no evidence that any comment was offered or complaint made at this time by the architect or the engineer with respect to the absence of shoring. It is also significant to note that the testimony of the engineer, who was present at the job on January 8, negatives the issuance of the aforementioned positive general directions. Referring to what transpired then, he said:

"Mr. ———* then asked me, said 'Does that mean we have got to shore all the columns in the building? What should we do? What should we do to determine it?' *I told him I didn't know what I would want to recommend until I received the readings, but that I felt that any column that showed a settlement in excess of two and one-half inches should* be shored." (Emphasis added.)

\* \* \* \* \* \*

"Q. Now, Mr. ———, how could this building have been protected to prevent a collapse in view of the situation that had developed there? A. I think the instructions, or *the advice*, I should say, that I gave Mr. ——— at this first indication of settlement, if any column settled over two and a half inches, it should be shored, would have prevented any further trouble." (Emphasis added.)

Obviously, in its strongest light, this was at most, a tentative recommenda-

---

\* The architect.

tion to the *architect* by the engineer and *not a directive to defendant.* It is also significant that no written instructions were issued then or afterward to defendant by the architect directing defendant to shore all columns where the settlement was more than 2½ inches. Defendant was never authorized by work order or otherwise to incur the expense necessary to undertake such a shoring up as plaintiff now contends should have been done, and no claim is made by plaintiff that the architects requested any authority from plaintiff to incur such expense. It cannot be said that this was an expense to be borne by defendant.

Defendant promptly undertook the load tests directed as aforementioned on January 14. The following day defendant's superintendent notified plaintiff's architects and engineers that the columns upon which the tests were being made had settled substantially. He then was notified to stop the load tests and shore these columns up, which he promptly did. It is significant to note that a work order signed by plaintiff and plaintiff's architect authorized defendant to incur the expense necessary to accomplish this work.

After January 8, defendant's superintendent on the job made additional readings and reported some, if not all, of the changes in elevation of the columns to the architects by telephone. There is a conflict as to whether one of the later readings showed significant amounts of settlement after January 8 with respect to a number of columns. Plaintiff contends that this reading did show such significant changes (specifically that 48 of 70 columns had settled appreciably) and that the results thereof were reported by defendant's superintendent to the architects by telephone. The superintendent testified that there were no such significant changes read and that no such report as claimed was made by him to plaintiff's architects. If these readings were in fact made and reported as claimed by plaintiff, this information would have been in the hands of the architects and engineers about two weeks before the partial collapse with which we

are concerned. This would have been notice to them that several columns had settled more than 2½ inches and thus, obviously, had not been shored in accordance with instructions which plaintiff claims were given to defendant on January 8, and, the record is clear that they gave no further order or directions for shoring to defendant before the collapse. Plaintiff's engineers and architects did not, at any time, instruct defendant or his employees to shore other designated columns. It has some importance also to note that plaintiff's production engineer, who is a graduate engineer, visited and viewed this construction work at least once a week and sometimes more often. Neither he nor anyone else for plaintiff made any suggestions or recommendations to defendant about shoring up or "protecting the work". It needs also to be understood that the cost involved for shoring up even one column would have been substantial. No additional shoring was ever done after the first columns were shored on January 15.

As this situation developed, plaintiff's engineers designed devices known as pile caps and shims to raise the settled columns, to lessen the load upon the friction-type piles and to place a portion of the load along the surface of the ground. Defendant obtained these materials as designed by the engineer and commenced installing them shortly after February 1, 1958, and thereafter pursued this corrective work with dispatch. At the close of the work day of Friday, February 14, this work had been completed on 44 of the columns. It is clear that there then was no need for any shoring with respect to these 44 columns. Plaintiff's superintendent testified that he took readings that day on all columns upon which caps and shims had not been installed and found no settlement of significance.

During the afternoon of Saturday, February 15, 1958, two columns, upon which caps and shims had not been installed, gave way and a portion of the roof of the building collapsed. No work was then in progress and no employees

of defendant were present. The failure of these two columns was sudden, and there was no opportunity for anyone, even if they had been present, to have prevented the collapse of the roof at that point. However, plaintiff maintains that the defendant should have made arrangements to keep the building under constant inspection and that had this been done, the large amount of ice and water on the roof could have been easily discovered. But, there is no proof that there was *excessive* ice and water on the roof on the afternoon of February 15. Some pooling of water (or ice if it were freezing) on the roof would have been normal, since the roof was designed to retain water to a depth of 2½ inches in the low part. It is without dispute that it was freezing the day after the collapse, but defendant contends that it was not freezing before, and daily weather records kept at the job showed that it was not. At least one witness for plaintiff testified that before the collapse it had been raining and snowing and that there was snow and ice on buildings. He also testified that after the collapse there was ice on the roof and photographs taken the morning after the collapse show ice on the roof. But, this evidence does not justify a finding that the collapse of the roof was due to an *excessive accumulation of ice and water,* or that by keeping the building under constant inspection the collapse could have been prevented. To so hold would be speculation.

■■ It is beyond question that the basic, underlying cause of the partial collapse of this building was either faulty design of the footings upon which the columns rested, or bad soil conditions or both. It cannot be said that defendant had any responsibility for either.

From all the evidence, facts, and circumstances a finding is compelled that plaintiff has not shown, by a preponderance of the evidence, that defendant negligently failed to protect the work, or, that any negligence on his part contributed in any way to the partial collapse of the building with which we are concerned. This seems especially clear since this record is notably silent as to what practice is followed by contractors generally to "protect the work" and with respect to what is required in that regard by architects generally.

With this finding of fact the cases in this state, and elsewhere, make clear the conclusions of law and the disposition which must be reached.

■ No case has been cited and none have been found, where a construction contractor who followed plans or specifications furnished by the owner's architects or engineers was held liable for the collapse of a building under circumstances such as those presented here. It is clear, however, by analogy at least, that a construction contractor in this state is not liable for the collapse of a building, in the absence of a warranty on his part, where he has followed plans and specifications furnished by the owner without a showing of negligence. The leading case on this subject in Mississippi is Trustees of The First Baptist Church v. McElroy, 223 Miss. 327, 78 So.2d 138, 141, where the Court stated:

"The rule has become well settled, in practically every American jurisdiction in which the matter has been involved, that a construction contractor who has followed plans or specifications furnished by the contractee, his architect or engineer, and which have proved to be defective or insufficient, will not be responsible to the contractee for loss or damage which results solely from the defective or insufficient plans or specifications, in the absence of negligence upon the contractor's part, or any express warranty by him as to their being sufficient or free from defects."

To the same effect is Havard v. Board of Supervisors etc., 220 Miss. 359, 70 So. 2d 875. See also Adams v. Tri-City Amusement Co., 124 Va. 473, 98 S.E. 647. The cases cited by plaintiff can be distinguished and are of little help here for in most, if not all of these, there was a positive and unequivocal undertaking

by the contractor to furnish a completed building. Such is not the case here. It, therefore, follows that plaintiff's complaint must be dismissed with cost to defendant.

An order is being entered in accordance with this opinion.