# Richmond

## WORLEY BROTHERS COMPANY, INC. v. MARUS MARBLE AND TILE COMPANY, INC.

June 10, 1968.

Record No. 6679.

Present, All the Justices.

*Peter W. Runkle (Lewis S. Pendleton, Jr.; Pendleton and Runkle, on brief), for plaintiff in error.*

*Aubrey R. Bowles, III (Aubrey R. Bowles, Jr.; Judson T. Vaughan, Jr.; Bowles and Boyd, on brief), for defendant in error.*

HARRISON, J., delivered the opinion of the court.

Marus Marble and Tile Company, Inc. (hereinafter referred to as Marus), the plaintiff, filed a motion for judgment against Worley Brothers Company, Inc. (hereinafter referred to as Worley), the defendant, seeking to recover the sum of $14,725.75. The trial court, sitting without a jury, entered final judgment in favor of the plaintiff for the full amount of its claim and the defendant was granted this writ of error.

In 1962, Worley, as general contractor, entered into a contract with the City of Richmond for the construction of jail facilities. Thereafter, Worley subcontracted with Marus, a tile contractor, to perform the tile work in accordance with plans and specifications (hereinafter referred to as specifications), dated July 2, 1962, prepared by the architects on the job. Our inquiry is limited to Section 20 of the specifications which concerns the installation of the tile. It provides in part as follows:

> "Set quarry tile in accordance with Specification No. 3 of American Standard Specification A108-1958, *except at vertical joints* which are to be filled with *black Furnane* instead of with pointing mortar." (Italics supplied.)

Under date of August 7, 1962, the architects issued their Addendum No. 1 to the original specifications wherein certain changes and additions were made. Included in this addendum is the following:

> "Section No. 20—Ceramic and Quarry Tile Under 'Setting, Grouting and Cleaning,' revise first sentence of second paragraph to read:
> "Set in accordance with Specification No. 3 of the American Standard Specification A108-1958, *except fill all joints* within the quarry tile with black Furnane instead of with 'pointing mortar'." (Italics supplied.)

A bid was submitted to Worley by Marus for the installation of

the terrazzo and tile as provided by the specifications. Mr. Marus testified he received from Worley only the original specifications, dated July 2, 1962, and that at no time prior to his bid, and until after the partial performance of his contract, did he receive or have any knowledge of Addendum No. 1. The controversy swirls about this addendum.

An agreement was negotiated and reduced to writing on December 6, 1962, whereby Worley accepted a proposal by Marus to furnish and install, for $78,000, ceramic and quarry tile in accordance with Section 20 of the project specifications as prepared by the architects—and also the terrazzo work, which is not involved here.

Marus began the performance of its contract and by December 5, 1963, the tile floor in the dining area of the jail was estimated at from 75% to 90% laid. On that date, Miles Cary Johnston, Jr., one of the architects, noted that Lumnite was being used to fill or grout the joints instead of black Furnane joint compound. The architect called this to the attention of Worley and Joseph F. Still, a foreman for Marus. His notes show that he then advised Worley that " '. . . all joints would have to be raked out and then filled with Furnane' ".

Still told the architect that in using Lumnite he was using the proper material as his specifications did not call for the use of black Furnane. Upon being shown the Addendum No. 1 to the specifications, which were on file in an office at the construction site, Still advised the architect and Worley that ". . . I don't have that addenda". Upon being advised that his company did have it, he responded: ". . . I don't think my company does. If they did, they certainly would not try to be using Lumnite instead of black Furnane". Still reported this development to Mr. Marus who told him to stop all work on the project.

The testimony of Mr. Marus was that Worley never sent him Addendum No. 1, and that the bid of his company was based upon the specifications as originally prepared by the architects and furnished him by Worley. This position he reiterated repeatedly in the correspondence that ensued between him and Worley.

Mr. Worley testified as to the diligence that he, as a general contractor, customarily used to assure that all specifications furnished subcontractors were complete with addenda. He was positive that he followed this procedure on the city jail job, and in connection with the specifications furnished Marus, but could not testify that Marus received the addendum.

Mr. Worley admitted that his first knowledge of any difficulty in connection with the use of Lumnite instead of Furnane came when Johnston made his inspection and inquired as to the material being used. He said that, in his opinion, he, Still and Johnston, all gained knowledge of the error at the same time.

Afterwards numerous conferences were had and correspondence exchanged, exploring the possibility of having the city accept the work that had been performed, i.e. the quarry tile installed with Lumnite instead of black Furnane, and with a reduction in cost to the city by reason of the installation of a less costly material. Worley referred to the mistake as "an honest mistake".

We observe that the specifications provided for the installation of quarry tile, factory waxed, of a certain size, to be set in Portland cement. Between the tile and the setting bed, the plans provided for a layer of "neat" cement. Mr. Marus testified that he used Portland cement as directed by the specifications for the setting bed, and used Lumnite, which he called "a high grade Portland cement", as pointing mortar for the filler or grout, although he could have used Portland cement. Lumnite is a dark gray color and more expensive than the Portland. It is also more resistant to stains, makes a better job and is used because it will not darken if grease is spilled on it.

Black Furnane is described as shiny or jet black and finishes like asphalt. It has two components, a powder and a liquid catalyst. It is regarded as superior and more resistant to stains than ordinary Portland or Lumnite and is much more costly. The architect stated that black Furnane was specified because the city wanted a mortar of superior quality, as did the State Department of Welfare and Institutions which had to approve the plans.

The negotiations between the interested parties looking to the acceptance of Lumnite instead of black Furnane in the tile joints proved fruitless. On April 3, 1964, the architect, in a letter to Worley, advised that these joints would have to be removed and replaced with black Furnane. The architect testified the city could have accepted ". . . something that is not in accordance with the contract. But we said we were not able to recommend it under any conditions. It had to be removed".

Worley then called upon Marus to correct the condition. Marus, as previously, again denied ever having received the addendum and responsibility for the error. Worley threatened to have a local sub-contractor correct the condition and to deduct all costs from money

due Marus under its contract. After an exchange of letters, Mr. Marus ultimately agreed to proceed with the removal of the Lumnite cement from the joints and to replace it with black Furnane. However, he wrote Worley that his company expected to be paid for the extra costs involved in complying with a specification that was not a part of its contract; that its action in doing the replacement work was with reservation of all its rights to require Worley to pay for the extra expenses and did not constitute a waiver in any regard of such rights; and that it would expect additional pay for use of black Furnane in the tile joints in the kitchen and dishwashing area, which portion of the contract had not then been commenced.

Worley's response to this letter took no exception to the conditions laid down by Marus, but urged that the corrective work be done immediately. Mr. Marus refused to do the work until receipt of Addendum No. 1 from Worley, which he stated had been promised to him.

Marus then completed the tile and terrazzo work and was paid $78,000. It made demand of Worley for the additional sum of $14,-725.75, representing materials furnished and work performed which were not contemplated under the original specifications and contract. The account was itemized as follows:

$4422.50 for installing black Furnane joints in quarry tile floor in kitchen;

$2658.45 for removing cement from joints in mess hall;

$7644.80 for installing black Furnane joints in mess hall.

Payment was refused and this action ensued.

The trial judge has settled all conflicts of fact, and the judgment entered must be viewed here in the light most favorable to Marus. It cannot be set aside unless plainly wrong or without evidence to support it. Code § 8-491 (1957 Repl. vol.).

This controversy stems from the use of the words "vertical joints" in the specifications.

The trial judge has found as a fact that Marus did not receive Addendum No. 1, and had no knowledge of its existence at the time its bid was submitted and accepted. Otherwise, he could not have reached the conclusion he did.

The specifications that were furnished Marus provided that the tile was to be set in Portland cement, *except* at vertical joints which were to be filled with black Furnane. Addendum No. 1 called for

*all* joints to be filled with black Furnane instead of with pointing mortar. This constituted a material change in the specifications.

Worley argues that the mistake in this case was unilateral, made by Marus in its interpretation of the requirements of the specifications with respect to the grouting of the vertical joints, and further that Marus was negligent in that it had within its reach the means of ascertaining the true facts but failed to do so. We cannot agree with this contention. The addendum was issued by the architects when it became obvious to them that the original specifications didn't say what they intended and needed clarification. The architect testified that after a number of tile contractors had called him, he realized that his intent was not clear, and he could "see how it could be mistaken"—otherwise he would not have issued the addendum.

Marus, father and son, have been in the marble and tile business since 1908. When asked what vertical joints mean, Mr. Marus testified: "That means on the base side; on the wall side; on joints in the base". He said there was no misunderstanding on his part of the specifications; that he knew ". . . what a vertical joint meant; that it is on the base part. It is not on the floor".

Joseph F. Still has been in the tile business for forty years. He testified: "The vertical joints I knew, according to my school, the vertical joints were the base joints". By that he meant, ". . . the base that is up against the wall. The joint that is going up in there". When asked if he had ever heard a floor joint called a vertical joint, this witness replied, "[n]ever have in my life".

Worley's witness, Bruno V. Chiari, an employee of Universal Atlas Cement Company, when asked if he was familiar with the phrase vertical joint, responded: "Only as it applies to wall tile, vertical joint, going up the wall".

The specifications regarding the tile work contained language that was clear to Mr. Marus and understood by him and others in the tile trade. Under the circumstances there was no reason for him to question the specifications, nor was he or his company negligent in not seeking further clarification. Neither was Marus under any duty to compare the set of specifications furnished it by Worley with one or more of the surplus sets that were on file in the contractor's office at the construction site. Marus and its superintendent and employees had a right to rely on the set of specifications that Worley had furnished it, both in bidding on the job and performing the contract.

It was developed in evidence that in preparing the specifications, the architect's use of the language "vertical joint" in the manner he did, was as a result of having "extracted" it from a catalog of the Atlas Furnane Company.

Counsel for Worley places much reliance on a bulletin or pamphlet of that company which is designed to promote and encourage the use of Furnane in preference to Portland cement.

Specifically the pamphlet urges the use of two of the company's products in the laying of tile: a red Furnane bed for the setting of the tile and black Furnane as a grout between the joints. To make all of this clear to prospective buyers of tile, and to the lay-public, the pamphlet has a two-page color spread showing four pieces of tile set in a red Furnane bed with an arrow pointing toward the bed, and with another arrow labeled "vertical joints" pointing to the space between the tile which is filled with black Furnane. This is a graphic and simple illustration promoting the sale of its two products and of how the company wants them to be used. Manifestly the black Furnane joints in this picture are vertical as they relate to each other and to the horizontal red Furnane setting bed. However, neither the use of the expression "vertical joints" in the manner done by one manufacturer, nor by the architect under the circumstances it was used in this case, is sufficient to alter the common and accepted meaning of vertical joints as the evidence shows the expression is used and understood in the tile and marble trade, and as the trial judge found the expression meant to Marus.

Here we are concerned with tile and joints between tile that will be laid on a floor, and tile and joints between tile that will be installed along the base of or on a wall. The evidence is that tile which goes up from the floor along the base or the wall is called vertical tile, and the same appellation follows the joints between the tile.

The law which controls has been aptly set forth by Mr. Justice I'Anson in *Richmond Inc.* v. *Ewing's Sons*, 200 Va. 593, 595, 596, 106 S. E. 2d 595, 597, where it was said:

"Generally, a construction contractor who has followed plans and specifications furnished by the owner which have proved defective or insufficient will not be responsible to the owner for loss or damage which results solely from the defective or insufficient plans and specifications in the absence of negligence on the contractor's part, *or any express guarantee or warranty by him as to their being sufficient or free from defects. Southgate* v. *Sanford &*

*Brooks Co.,* 147 Va. 554, 561, 562, 563, 137 S. E. 485, 487, 488; *Adams* v. *Tri-City Amusement Co.,* 124 Va. 473, 476, 98 S. E. 647, 648; *State* v. *Commercial Casualty Ins. Co.,* 125 Neb. 43, 248 N. W. 807, 88 A. L. R. 790; 9 Am. Jur. § 28, p. 20. See also Anno. 88 A. L. R. 797." See also Anno. 6 A. L. R. 3d 1394.

The court in *City of Elgin* v. *Joslyn,* 136 Ill. 525, 26 N. E. 1090, was confronted with a contractor who bid on plans that subsequently were found to be incomplete. There the contractor was permitted to recover in assumpsit for work that was not included in the plans although the architect intended that such work be so included. The court said:

> "Plaintiff's sixth instruction lays down the rule that a contractor who bids for work is bound only by the specifications which are shown to him at the time he bids, and upon which his bid is based, and not by other specifications not then shown to him, and of which he was then ignorant, so that he did not and could not consider them in making the estimates for his bid." 136 Ill. at 528, 26 N. E. at 1091.

In *Staley* v. *New,* 56 N. M. 756, 759, 250 P. 2d 893, 895, the court held:

> "Manifestly it would be inequitable and unjust to hold that a general contractor or a subcontractor cannot rely upon specifications given to them for the express purpose of submitting a bid. The rights of the parties are to be measured and determined by the particular set of plans and specifications . . . upon which the contractor and subcontractor submitted their bid. The rule is well stated by the Supreme Court of Illinois in the case of *City of Elgin* v. *Joslyn,* 136 Ill. 525, 26 N. E. 1090, 1091: 'A contractor who bids for work is bound only by the specifications which are shown to him at the time he bids, and upon which his bid is based, * * *.'
>
> "It is generally held that where a building contract refers to the plans and specifications and so makes them a part of itself, the contract is to be construed as to its terms and scope together with the plans and specifications. [Citing cases.] And where the plans and specifications are by express terms made a part of the contract the terms of the plans and specifications will control with the same force as though incorporated in the very contract itself." [Citing cases.]

In *Wunderlich Contracting Company* v. *United States*, 240 F. 2d 201, 205 (10th Cir. 1957), the court held that there was no meeting of the minds of the parties to do work other than that contemplated by the contract, and if such work was required and the defendants received the benefit of it, plaintiffs were entitled to recover the reasonable value. The court said:

"A contractor who bids for work has the right to rely on the plans and specifications submitted to him for bidding purposes. The rights of the parties are to be measured by them. It is only through the plans and specifications that he can make an intelligent bid. *Ryan* v. *Curlew Irr. & Res. Co.*, 36 Utah 382, 104 P. 218. Burdens other than those contemplated by the contract, may not be placed upon the contractor without additional compensation. *Continental Casualty Co.* v. *Schaefer*, 9 Cir., 173 F. 2d 5, certiorari denied 337 U. S. 940, 69 S. Ct. 1517, 93 L. Ed. 1745."

In *Adams* v. *Tri-City Amusement Company*, 124 Va. 473, 98 S. E. 647, the contractor constructed walls in compliance with plans and specifications furnished him. The walls fell on two occasions and were finally rebuilt with changes suggested by the contractor and approved by the owner, but later repudiated. The contractor was granted compensation for all his extra work. The opinion of the court includes the following sentence: "For such a defect a building contractor cannot be held responsible, for it is his duty to follow the plans and specifications furnished as his guide by the architect as the agent of the owner." 124 Va. at 476, 98 S. E. at 648.

We hold that there was no meeting of the minds of Mr. Worley and Mr. Marus when they contracted on October 6, 1962, to do work other than that contemplated by the specifications, absent the addendum. Thereafter, at the request of Worley, material was purchased and work done different in character and cost from that originally contemplated, i.e. the installation of Furnane rather than Portland cement. Worley received the benefit of the additional work, and Marus is therefore entitled to recover the reasonable value.

The trial court found this to be a case of mutual mistake of fact between Worley and Marus. It found no fraud on the part of Worley, but held that Marus was entitled to recover the reasonable value of its work done by reason of the mistake. The decision of the trial court is supported by the law and evidence, and the assignment of error which questions the judgment on this ground is without merit.

Worley argues that the written contract between the parties

should not have been admitted in view of the plaintiff's allegation in the pleadings that the action was based on open account. A passage of the general conditions contained in the specifications is cited whereby the subcontractor agrees to be bound to the contractor by the terms of the agreement, general conditions of the contract, supplementary general conditions, the drawings and specifications and to assume toward him all the obligations and responsibilities that he, by these documents, assumes toward the owner.

Admittedly, the contract between Worley and Marus incorporated by express reference all plans and specifications as a part thereof. However, and as we have pointed out, their contract did not contemplate Addendum No. 1, of which Marus had no knowledge. The trial judge has properly found that it was not a unilateral mistake of Marus and that the extra work and additional expense imposed on Marus was caused by the failure of Worley to furnish the addendum to Marus. Admission in evidence of the specifications, the addendum issued subsequent thereto, the contract of December 6, 1962, as well as other documents, correspondence and evidence relating to the contract and undertaking between these parties, was proper. The action for different materials furnished and for extra labor performed by Marus, which was not included in the specifications, is based upon an itemized open account filed with the motion for judgment; but this account grows out of the contract of work called for in the specifications and ordered by Worley. We find no error in the action of the trial court in overruling the defendant's objection to the admission of the written contract.

Worley complains that the amount of the judgment is not supported by the evidence and points to that part of the award which it claims is based upon defective workmanship by Marus. It argues that the remainder of the award was clearly an inflated and unreasonable amount. No objection was voiced when the account reflecting the claim of Marus was offered in evidence, and its several items proved, and no serious effort was made to contest the correctness of these items in the lower court. Rule 1:8, Rules of Court, provides, in effect, that unless reasonable objections are made to the admissibility of evidence, or other matters requiring a ruling or judgment of a trial court, and the ground of objection is stated with reasonable certainty, such objection will not be considered by this court.

In this case the trial court observed that the amount paid Marus

by Worley, plus the amount sued for, represents fair compensation for work done at the special instance and request of Worley.

Counsel for Worley argued certain deviations on the part of Marus from the specifications, and the trial judge observed they were *de minimis*, such as normally occur in a contract of this size. The record shows that they were either waived, approved or were of minor consequence. Worley felt that the job had been done in a workmanlike manner, and made every effort to get the city to accept the tile as it had been laid by Marus. Mr. Chiari was of the opinion that Lumnite, the product of his company, should have been used for both the setting bed as well as the grout, and he questioned the workmanship. However, the specifications that Marus was following called for the use of Portland cement for both the setting bed and the grout. The substitution of Lumnite as a grout by the subcontractor was not such a material deviation from the specifications as should have rendered the work unacceptable, for admittedly it was more costly and of superior quality to regular cement.

The uncontradicted evidence is that black Furnane is twice as expensive as Portland cement and much more tedious and difficult to apply. There is nothing in the record to contradict the items enumerated by Marus which reflect the cost of removing the cement from the joints in the mess hall, preliminary to installing black Furnane therein, and the increased cost of installing black Furnane joints instead of cement in the mess hall and in the kitchen.

The trial judge was unwilling to speculate as to what might have been the attitude of the city or the architects had Chiari's report on the installation of Lumnite as a grout been more favorable, or had Lumnite been used for both the setting and the grout, or had Portland cement been used entirely. Taking the architect's testimony at its face value, no substitute for black Furnane was acceptable, or would have been recommended, "under any conditions".

From a consideration of the record, we are of the opinion that the evidence supports the findings and that the judgment of the trial court was right. We find no reversible error and the judgment is therefore

*Affirmed.*