# Richmond

PETTIBONE WOOD MANUFACTURING COMPANY v. PIONEER CONSTRUCTION COMPANY, INC., ET AL.

November 27, 1961.

Record No. 5342.

Present, Spratley, Buchanan, Whittle, Snead, I'Anson and Carrico, JJ.

*Aubrey R. Bowles, Jr.* and *B. Purnell Eggleston* (*Bowles, Boyd & Herod; Eggleston, Holton & Glenn*, on brief), for the plaintiff in error.

*William L. Martin* and *William J. Lemon* (*Martin, Martin & Hopkins*, on brief), for the defendants in error.

CARRICO, J., delivered the opinion of the court.

Pioneer Construction Company, Incorporated, hereinafter referred to as the plaintiff, filed a petition for attachment against Pettibone Wood Manufacturing Company, a foreign corporation, hereinafter referred to as the defendant, alleging that the defendant was indebted to the plaintiff in the sum of $71,499.94 for damages for breach of contract. The petition sought to attach funds belonging to the defendant in the hands of a co-defendant.

The issue of the defendant's alleged indebtedness to the plaintiff was submitted to a jury, which returned a verdict in favor of the plaintiff for $60,875.77. The verdict was approved by the trial judge and a final judgment in the amount thereof was entered against the defendant who sought, and was granted, a writ of error.

The plaintiff, a contractor engaged in the construction of highways, was awarded a contract by the State Highway Department to lay the base materials on a highway to be constructed near Harrisonburg. The defendant is a manufacturing concern, and one of its products is a "pulverizer" or "preparizer", which is designed to crush and mix, on the job site, the base materials used in highway construction. The plaintiff, in anticipation of its performance of its contract with the highway department, on June 19,1958, entered into a written agreement with the defendant, which was prepared by the plaintiff's president, and which is herewith set forth verbatim:

"Mr. Robert Churchill
Pioneer Construction Co.,
Roanoke, Va.

Dear Bob:

Based upon certain guarantees, conditions and agreements, as out-lined below, between your firm and Pettibone Wood, it is agreed that you will place an order for one machine, Model P-640B, to be de-livered no later than September 1958.

*Customers Guarantees*

Pioneer Construction Company guarantees the conditions listed below as being those under which the pulverizer will have to operate;

1.  Total quantities to be crushed 100,000 tons.
2.  Gradation—Pit run material 80% 3″ minus -
       20% to be crushed to 3″ minus.
3.  Crushing requirements—3″ minus with fines or 200 mesh mate-rial not to exceed 25% of the crushed material.
4.  Maximum size of pit run material—12″.
5.  Processing procedures—Pioneer Construction Company is to place material in the flat which will be 12″ compacted or 24″ which they feel will be necessary to place in six to three 4″ compacted lifts—it may be possible to cut this down to 6″ compacted lifts.

*Factory Guarantee*

Pettibone Wood Manufacturing Company guarantees the following conditions:

1.  Production more than 200 TPH.
2.  That the oversize material will be processed—crushed 100% passing the 3″ screen with occasional oversize.
3.  That the quantity of fines produced will not exceed 25% of the total quantity of material processed.
4.  That this material can be processed and in 4″ compacted lifts or possibly 6″ compacted lifts.
5.  That the material to be processed shall be processed in the flat and not from windrows—all material to be processed as coming to the job from the pit—no screening of oversize or little handling necessary.

## COST

12¢ a ton for wearing parts such as paddle plates, end standards, etc., and including the cost of parts with the freight for any and all breakdowns. This does not include normal maintenance to the machine and does not include the cost of the tractor, etc. The overall cost will be less than 25¢ a ton including the tractor, personnel, depreciation, maintenance, etc.

## TRIAL PERIOD

Not to exceed 5 working days—it is felt that this is sufficient length of time to determine the length of life of the paddle plates and the general operation of the machine.

In the event the machine fills the above guarantee the customer is to buy the machine. In the event it does not meet the above guarantee then the customer has the option of returning it to the factory at no cost to him other than one-way freight."

The agreement was signed by L. B. Hardison, who was district manager of the defendant, and by Robert Churchill, Jr., who was president of the plaintiff corporation.

The plaintiff placed its order for the machine, at a price of $29,-500.00, in accordance with the above agreement, which was confirmed and accepted by the defendant on August 16, 1958. The machine was delivered to the job site in the latter part of September, 1958.

On September 29, 1958, the defendant forwarded a letter to the plaintiff confirming an agreement that the plaintiff would avail itself of a 5% cash discount on the purchase price of the machine and would pay in full therefor on or before October 10.

On October 4, 1958, at the request of the plaintiff, the defendant agreed, in a letter written to the plaintiff, that it would warrant the machine against defective workmanship for a period of 400 working hours as indicated by the hour meter, the warranty not to include any wearing parts and not to be effective if the rock being pulverized at the time of a failure did not meet the gradation as outlined in the customer guarantee section of the contract of June 19, 1958.

Trial tests of the machine were commenced with representatives of the plaintiff, the defendant and the highway department present. During the trial test considerable difficulty was experienced with the machine, caused, for the most part, by "paddle plates" becoming

loose or breaking off. However, on October 8, 1958, when the machine had been operated seven hours, the plaintiff wrote the defendant stating that it was well satisfied with the machine, and that it was expected that the Department of Highways would give its approval within the next week and that when such approval was given the plaintiff would send a purchase order for the machine.

On October 17, 1958, when the machine had been operated for 20 hours, the highway department approved the material processed. On October 23, 1958, the plaintiff wrote the defendant complaining of the difficulty it was having with the "paddle plates" on the machine, and of the fact that the cost of operation was in excess of that set forth in the contract of June 19, 1958. The letter stated that the plaintiff was in a position to pay for the machine immediately but that it did not feel that it should pay until the machine had proven satisfactory. The letter concluded with the statement, "[T]he day that you show that the paddles will stay on, we will send you a check in the amount of $28,025.00."

On November 13, 1958, when the machine had operated for 77 hours, the plaintiff forwarded the defendant a check for $26,959.30 in full payment of the machine. The check was enclosed in a letter from the plaintiff to the defendant which called attention to the agreement of June 19, 1958, and pointed out that the plaintiff's cost of operation had amounted to $0.40 per ton, which was $0.15 per ton over the agreement or $7,500.00 for the whole job. In the letter the plaintiff stated, "[W]e are paying for the machine, but are also looking for the full agreement for this job and the guarantee of 400 hours on the machine."

The plaintiff thereafter used the machine and satisfactorily completed its contract with the highway department, processing approximately 70,000 tons of material in 400 hours of operation on the Harrisonburg project. The machine was then used on two other projects, and on September 30, 1959, the plaintiff advised the defendant that, "[W]e have now finished your 100,000 ton guarantee."

The operation of the machine, from the time it was delivered until it had crushed 100,000 tons of material, was accompanied by numerous breakdowns. The plaintiff contended that the difficulty was caused by defective materials and workmanship in the construction of the machine. The defendant admitted that some of the trouble was caused by defective parts, and furnished replacements therefor, as it was required to do under its warranty against defective workmanship set forth in its letter of October 4, 1958. The de-

fendant contended that most of the difficulty arose because the plaintiff attempted to crush oversize material, which the machine was not equipped to handle.

It is the plaintiff's position that by the agreement of June 19, 1958, the defendant guaranteed that the cost of operation to crush 100,000 tons of material would not exceed $0.25 per ton, or a total of $25,000.00. The plaintiff calculated its cost of such operation, however, to be $96,449.94, and the action brought by the plaintiff was to recover the portion thereof in excess of $25,000.00.

The defendant contends that the agreement of June 19, 1958, constituted a sale on trial or approval and that the plaintiff thereafter tried the machine and approved and purchased it; that the "guarantees" in the agreement related only to the five day trial period, and that the plaintiff's only remedy under the agreement was to return the machine if it proved to be unsatisfactory.

The defendant has assigned a number of errors to the actions of the trial court, but in the view we take of the case it is only necessary that we consider the first assignment, which is that the court erred in failing to strike the evidence of the plaintiff at the conclusion of the plaintiff's case.

Both of the parties contended in the trial court, and take the same position before us, that the agreement of June 19, 1958, is not ambiguous. We agree that it is not ambiguous, but since the interpretation sought by the plaintiff, which was adopted by the trial court, is at such complete odds with the interpretation contended for by the defendant, it is our duty to decide which interpretation is correct. This may be done only by determining, from the four corners of the agreement and the language therein used, the true intent of the parties.

Our construction of the agreement should be reasonable and just. An interpretation that would place one party at the mercy of the other should, if at all possible, be avoided. *Sanford* v. *Brown Bros. Co.*, 208 N. Y. 90, 101 N. E. 797, 799; 4 Mich. Jur., Contracts, §40, p. 375, §48, p. 391.

It is important, in the disposition of the issue before us, that a clear distinction be made between the "guarantees" contained in the June 19, 1958, agreement and the warranty against defective workmanship contained in the defendant's letter of October 4, 1958. Whatever might have been the undertakings of the defendant in the agreement, they were in our view, completely separate and apart from its undertaking in the warranty letter. One does not add to nor take away from the other. If, as the defendant contends, the agree-

ment is merely for a sale on approval, the warranty letter does not change that status. On the other hand, the warranty in the letter would be effective when the sale was completed, even if the sale was on trial or approval, which the defendant recognized by honoring the warranty. Any alleged breach of the warranty contained in the letter is not in issue before us. As plaintiff states in its brief, "Pioneer's sole claim is that the actual cost for crushing one hundred thousand tons of stone exceeded the 25¢ per ton over-all cost as warranted by Pettibone in the contract of purchase by $60,875.57."

■ We are of the opinion that by the agreement of June 19, 1958, the parties clearly bargained for a sale on trial or approval, and that the representations made therein related only to the five day trial period.

In some cases, where there is a sale on trial or approval, the purchaser need not specify his reason for disapproval in order to entitle him to return the article. His rejection of the article is all that is necessary to prevent the sale from becoming absolute. 46 Am. Jur., Sales, § 500, p. 662.

In the case before us, however, the written agreement contained the conditions which were to be attached to the right of rejection. If, after the trial by the plaintiff, the conditions set forth in the agreement had been met, the plaintiff was bound to pay for the machine. On the other hand, only if the conditions were not met would the plaintiff have had the right to disapprove of and return the machine.

The obvious purpose of the guarantee sections in the agreement was to provide the parties a guide for the testing of the machine during the trial period and to set forth the basis to determine if, after the trial, the plaintiff would be justified in exercising its option to return the machine.

But, the plaintiff argues, we should not adopt such a construction because it would have been impossible for it to determine in the five day trial period whether the machine would crush 100,000 tons of material at 25¢ per ton as, the plaintiff claims, the defendant guaranteed.

This argument is answered by saying that to give to the agreement the interpretation sought by the plaintiff would mean that the trial period would have had to be extended until 100,000 tons had been crushed. This was clearly not the intention of the parties. What they said, in language used by the plaintiff, was that the trial period of

five working days was sufficient "to determine the length of life of the paddle plates and the general operation of the machine." The paddle plates were considered wearing parts and the cost of their replacement was to be borne by the plaintiff. In the general operation of the machine there was involved, of necessity, its cost of operation, its capacity to perform and its rate and manner of production. If the plaintiff thought it needed more time for an adequate test it should have so stipulated in the agreement.

The agreement of June 19, 1958, does not, as the plaintiff contends, contain a guarantee that the machine would process 100,000 tons of material at 25¢ per ton. The only reference to the quantity of material to be crushed is found in the customer's guarantee section of the agreement. Why the plaintiff, in preparing the agreement, placed it there we need not inquire. If it had been intended as a part of the factory guarantee, it would surely have been placed in that section. The section relating to cost is not a part of the factory guarantee. Those things guaranteed by the factory are set forth in numbered paragraphs, while the paragraph relating to costs is given a separate, unnumbered, heading.

The language of the agreement concerning cost must be construed to have been only an estimate, to be used as a guide in the test period. Obviously, many of the factors involved in cost were under the complete control of the plaintiff. For example, the first item making up the plaintiff's claim, as set forth in the petition for attachment is for "[t]he cost of a tractor for a period of nine months at a monthly rental of $3,150.00 per month . . . $28,350.00". This one item alone exceeded what the plaintiff says was to be the total cost of operation. At the trial this item was reduced to $2,248.00 per month, or a total of $20,332.00, because the plaintiff erred in its estimate of a reasonable rental. It was not satisfactorily explained why this cost was so high or to whom the plaintiff paid the rental, but the presence of such an item dramatically points up that the parties could not have intended the paragraph concerning cost to provide anything more than a mere estimate. Any other construction would, indeed, place the defendant at the mercy of the plaintiff.

The plaintiff paid for the machine, after full opportunity to test it and with knowledge of the fact that the cost of operation was in excess of what the plaintiff claimed had been guaranteed. It thereby accepted the machine and waived what it now alleges was a breach of the provisions of the June 19, 1958, agreement. *Brown* v. *Austin-Western Co. Ltd.*, 111 Va. 209, 213, 68 S. E. 184; 77 C.J.S., Sales,

§ 345 (b) p. 1246, 1 Williston on Sales, 3d Ed. § 207, 46 Am. Jur., Sales, § 377, p. 557.

The plaintiff, by the final paragraph of the agreement, was given the right to return the machine to the defendant at no cost except one way freight if the machine did not meet the standards set for the test during the trial period. The defendant, in such case, would have been bound to accept the return and to relieve the plaintiff of liability for payment.

We must assume that the provisions of the final paragraph were inserted in the agreement to mean something. Fairly construed, they mean that the parties, in advance, agreed upon a rule of damages to be followed if the machine was not what the defendant said it was. The parties thereby fixed the plaintiff's exclusive remedy, which was to return the machine, and no other or different remedy is available to the plaintiff. Having chosen not to pursue that remedy, the plaintiff cannot now be heard to complain that the machine was not satisfactory. *Welch, et al.* v. *McDonald*, 85 Va. 500, 505, 8 S. E. 711; *Marion Machine, Foundry & Supply Co.* v. *Cincinnati Coffin Co.*, 162 Ohio St. 455, 124 N. E. 2d 132, 138; *Twin City Creamery Co.* v. *Godfrey*, 176 Mich. 109, 142 N. W. 362, 363; 46 Am. Jur., Sales, § 721, p. 844.

For these reasons, we think the trial judge should have granted the motion of the defendant to strike the plaintiff's evidence at the conclusion of the plaintiff's case. It was error for him to refuse to do so. Accordingly, the verdict of the jury will be set aside, the judgment reversed and a final judgment entered here in favor of the defendant.

*Reversed and final judgment.*