## Richmond

### Joseph O. Hutchison v. J. Rodney King.

November 29, 1965.

Record No. 6037.

Present, All the Justices.

*John T. Hazel, Jr. (J. William Gilliam; Kelly, Farley & Lawson,* on brief), for the plaintiff in error.

*(Peter A. Cerick,* on brief), for the defendant in error.

GORDON, J., delivered the opinion of the court.

This action was brought on a contract for the placing of sod or turf on the ditch lines of the access road to the Dulles International Airport.

J. Rodney King, who is a landscape contractor, had entered into a subcontract with the general contractor (the general contractor with the Federal Aviation Agency or "F.A.A.") by which King agreed to do landscape work at the Airport. The contract sued on is a sub-subcontract between King and Joseph O. Hutchison by which Hutchison agreed to place sod on the ditch lines of the access road for King.

Hutchison alleged that by the contract sued on, he agreed to place 17,300 square yards of sod on the ditch lines, and King agreed to pay him 40¢ per square yard for sod placed in accordance with the terms of the contract. Hutchison placed more than 17,300 square yards during June and July 1961. Having been paid by King for only 7,033 square yards, Hutchison asked judgment for the amount owing on the remaining 10,267 square yards, $4,106.80, plus interest and costs.

King contends that the lower court correctly entered judgment for him, since he owes Hutchison nothing for the 10,267 square yards. Admittedly, Hutchison placed at least 17,300 square yards of sod on the ditch lines, but the 10,267 square yards in question were dislocated or washed away by storms during June and July 1961, soon after the sod was placed. King says that under the terms of the contract he was obligated to pay Hutchison only if the sod was approved for payment by the "contracting officer", and that Hutchison did not satisfy this condition.

The questions are: (1) Did the contract between Hutchison and King, properly interpreted, (a) require only that Hutchison place the sod in a manner satisfactory to the "contracting officer's" representative at the job site, or (b) require also that the sod as placed be approved for payment by the F.A.A.? (2) Did Hutchison perform his agreement under the contract so as to entitle him to recover for the 10,267 square yards of sod for which he was not paid?

[1] It was incumbent upon the trial judge, and it is now our function, to interpret the contract from the facts at hand.

The oral contract was made by Hutchison and Orlando King, who acted as agent for his brother, J. Rodney King. (There was no direct communication between Hutchison and J. Rodney King until after the consummation of the oral contract on or about June 1, 1961.)

Later, a letter was signed by J. Rodney King and Hutchison to confirm the understanding.

According to Hutchison, the oral contract obligated him to obtain sod that was "good enough" and "put it in the ditch lines", and it was agreed he "was to receive payment each month for all sod put on the job in an approved manner".

Hutchison said he made these points clear to Orlando King, when the oral contract was made: "I am not putting it in to be accepted six months from now by the engineers or anyone else. It was to be put in, in an approved manner, on that date. There was no guarantee, either written or verbal that I would do anything to the sod to maintain it. There was no maintenance clause anywhere. There was never any in our discussions. I was furnishing and placing the material. And that was our agreement purely and simply with Mr. Orlando King".

Orlando King's testimony respecting the oral understanding was: "[T]he agreement was, he [Hutchison] was to be paid as soon as the amount was approved by the Contracting Officer, by the inspectors. When that amount was approved, then my brother would pay him, that he would not have to wait until my brother got his check, and that that estimate went in the 15th of every month. As soon as the Inspecting Officer said what they were going to pay for on that estimate, then Mr. Hutchison would be paid that amount right away".

It should be noticed that Orlando King's testimony corroborated Hutchison's testimony in that he referred to approval "by the Contracting Officer, by the inspectors" or the "Inspecting Officer".

Otherwise, it is not clear what point Orlando King intended to emphasize in his testimony concerning the oral contract. He may have intended to refer only to the times when Hutchison would be paid for work approved by the inspectors, for King made it clear that "he [Hutchison] would not have to wait until my brother got his check and . . . that estimate went in the 15th of every month". On the other hand, he may have intended to describe the understanding as requiring acceptance for payment by the Government as a condition to Hutchison's right to receive payment.

Whatever interpretation might be given to Orlando King's testimony about the oral understanding, J. Rodney King is bound by the provisions of the confirming letter, which has been mentioned. This letter, dated June 12, 1961, was written by J. Rodney King to

Hutchison; and Hutchison signed it to evidence his approval. It reads:

"This letter is to confirm your agreement to furnish, deliver and place the sod /a/ :40¢ per sq. yd., as per the specifications and to the satisfaction of the Contracting Officer.

"We will pay you each month for the amount turned in and accepted by the Engineers.

"Any decisions relative to the Job will be up to my brother Orlando."

The intent of the first and second paragraphs of the letter must be determined.

*"This letter is to confirm your agreement to furnish, deliver and place the sod /a/ .40¢ per sq. yd., as per the specifications and to the satisfaction of the Contracting Officer."*

The first part of this paragraph confirms Hutchison's position, that Hutchison agreed "to furnish, deliver and place the sod". No reference is made to any obligation to maintain the sod or to any warranty that the sod would remain in place after it was laid.

The succeeding words prescribe that the sod must be placed "as per the specifications and to the satisfaction of the Contracting Officer".

"The Contracting Officer" is not identified in the letter, but his identity, or at least the identity of his designated representative, may be made clear by reference to the testimony of Frank J. Quish, an engineer in the employ of the firm of Amon and Whitney, and by reference to the Federal regulations relating to Government contracts.

Quish testified that Amon and Whitney was employed by the F.A.A. to act as the supervising engineers for the construction of the Airport. The firm's responsibility was "to take the project plans and specifications and see to it that they are abided by".

The firm of Amon and Whitney, then, acted as "Resident Engineer" for the Airport project, as that term is defined in the Code of Federal Regulations. The Code provides (in Chapter 1 thereof entitled Federal Procurement Regulations): "The term 'Resident Engineer' means that employee of the Government designated to represent the Contracting Officer at the site of the work for the purpose of inspecting the work to determine if it meets contract requirements". 41 C.F.R. § 2-7.601.1. As Resident Engineer, Amon and Whitney was the representative of the Contracting Officer at the job site, with the duties outlined in the definition.

It follows that if Hutchison furnished, delivered and placed the sod to the satisfaction of the firm of Amon and Whitney, he performed this undertaking "as per the specifications and to the satisfaction of the Contracting Officer". This conclusion necessitates an examination of additional evidence to determine what person or persons were authorized by Amon and Whitney to determine, on behalf of that firm, that sod had been laid in accordance with the plans and specifications.[1]

Quish represented Amon and Whitney as office engineer during the construction of the Airport. He was "retained by . . . [his] company to prepare these estimates, to keep records of the construction procedures and accomplishments, and also to see to it that the contractor, the prime contractor is paid on a periodic basis, that is, once a month, on a predetermined date."

During the course of the actual laying of the sod, Quish had inspectors on the job on a daily basis. Their duty was "to see to it that the contractor, or subcontractor, as you will, does the work that he is responsible for in accordance with the specs . . . in this case we abide by the Virginia Department of Highways specifications."

It is apparent from Quish's testimony, which was not contradicted, that he was the authorized representative of Amon and Whitney to determine whether the sod had been placed "as per the specifications and to the satisfaction of the Contracting Officer". And in making the determination, Quish relied upon the inspectors at the job site, who gave him daily reports of sod laid according to the specifications.

In the light of the uncontradicted evidence, we interpret the first paragraph of the letter as confirming Hutchison's agreement or undertaking to furnish, deliver and place the sod to the satisfaction of the office engineer of Amon and Whitney, that is, in a manner acceptable to him or to his inspectors at the job site as having been placed in accordance with the specifications.

■ We turn now to consideration of the second paragraph of the letter:

*"We will pay you each month for the amount turned in and accepted by the Engineers."*

[1] Although the conjunctive "and" is used in the letter, between "specifications" and "satisfaction", the placing of the sod was necessarily satisfactory to Amon and Whitney if the work was performed in accordance with the specifications. The responsibility of Amon and Whitney was to "see to it that they [the project plans and specifications] are abided by".

King has described Hutchison's agreement or undertaking in the first paragraph of the letter. It might have been expected that in the second paragraph he would set forth his promise to pay, and the times he would pay, for Hutchison's performance of his agreement as described in the first paragraph. And King did this; he turned to a description of his reciprocal undertaking, beginning with the words "We will pay you".

The words of the second paragraph "the amount turned in and accepted by the Engineers" are consistent with Hutchison's agreement, as set forth in the first paragraph, if they refer back to the furnishing, delivery and placing of sod in accordance with the specifications and to the satisfaction of the Contracting Officer. And these words should be interpreted as referring back to Hutchison's undertaking as described in the first paragraph. King, a subcontractor for the Airport project, must have known that the Resident Engineer represented the Contracting Officer at the job site and, also, that the engineering firm of Amon and Whitney had been designated as Resident Engineer. It follows that, by referring to the "Engineers" in the second paragraph, King intended to refer to Amon and Whitney, the "Resident Engineer" and, as such, the representative of the "Contracting Officer" who was referred to in the first paragraph.

King would have us interpret the provisions of the second paragraph as imposing a further condition upon Hutchison's right to receive payment: the condition that the sod be approved for payment by the F.A.A. or the Government. But such an interpretation would be inconsistent with the language of the first paragraph of the letter, which purported to describe Hutchison's undertaking fully.

In effect, King is asking us to supply words at the end of the second paragraph; the words "for payment by the F.A.A. or the Government". In our opinion, the supplying of these words would be improper. To do so would change the meaning of the paragraph as written. And even if the provisions of the second paragraph are ambiguous, they should be interpreted against King, who wrote the letter. *Enlow & Son* v. *Higgerson*, 201 Va. 780, 113 S.E.2d 855 (1960).

Moreover, as already pointed out, the provisions of the first and second paragraphs of the letter would be mutually conflicting if we were to supply words and interpret the second paragraph as requiring acceptance for payment by the F.A.A. Where provisions of an instrument appear to be mutually conflicting, the provisions should

be reconciled where (as here) reasonable basis for reconciliation is afforded by the language of the instrument. *Ames* v. *American National Bank,* 163 Va. 1, 176 S.E. 204 (1934).

We find that the intent of the language of the second paragraph of the letter was to set forth King's agreement to pay Hutchison, in monthly installments, upon his performance of the undertaking set forth in the first paragraph, as already interpreted by us. The trial judge's interpretation of the intent of the letter was different from our interpretation; but we are not bound by his interpretation. *Magann Corporation* v. *Electrical Works,* 203 Va. 259, 123 S.E.2d 377 (1962).

■ The remaining question is whether Hutchison performed his undertaking under the contract, as we have interpreted it. In view of the decision of the trial judge, who heard the evidence without a jury, the facts will be stated in the light most favorable to King insofar as they are controverted.

Hutchison began his task of placing the sod on the ditch lines on June 13, 1961, and worked approximately two days. Then, said Orlando King, "there came a bad storm and washed out a lot, and that's about all he did work in June". Hutchison repaired the damage to the sod caused by the storm in June.

Hutchison continued his work in July. A second storm occurred on July 14, and, according to Orlando King, "it washed out a lot of sod including some that had already been repaired. What had been repaired washed out, too". Hutchison "put down a little" sod after the July 14 storm.[2]

A third storm occurred on July 24. Orlando King estimated that three-fourths of the sod placed by Hutchison was ruined completely by that storm. Hutchison did no work after July 24.

Hutchison placed more than 17,300 square yards of sod on the ditch lines to the satisfaction of the inspectors at the job site. His testimony, based on his measurements, was not contradicted. Frank J. Quish, the office engineer of Amon and Whitney who has been

---

[2] Hutchison said that he placed additional sod after the first two storms "to help Mr. King" and in reliance upon King's promise that he would be paid for it. By his letter of July 24, 1961, Hutchison agreed to do "minor repair work that may be necessitated by storms". Orlando King said that Hutchison replaced the sod after the first two storms upon his (King's) insistence, without any promise of additional payment, and that he called upon Hutchison to replace the sod damaged by the third storm. This conflicting testimony shows only that Hutchison and King disagreed about Hutchison's obligation under the contract to maintain or replace sod.

mentioned, corroborated Hutchison's testimony respecting the amount of sod. Also, Quish's testimony showed approval of the sod as placed.

Quish's inspectors had the authority to halt the work in progress or to require it to be changed so as to meet the specifications. Quish said it would be fair to conclude that work done during a given day had been done in a manner acceptable to these inspectors, since otherwise the inspectors would not have allowed the work to continue.

According to Quish's records—the daily reports turned in by the inspectors—Hutchison placed more than 17,300 square yards of sod that were approved as having been placed in accordance with the specifications.

King's contract with the general contractor was not introduced in evidence. No doubt it included a clause requiring maintenance of the sod or final approval of the sod for payment by the Government, since King replaced some of the sod laid by Hutchison after it had been dislocated by the third storm, and he seeded other areas. King was paid for approximately 18,796 square yards of sod at the rate specified in his subcontract, 60¢ per square yard. By agreement, he received payment for certain areas that were seeded (instead of resodded) and accepted as sodded areas. As already noted, however, Hutchison's right to recover from King was not dependent upon acceptance of the sod for payment by the Government.

The uncontroverted facts prove that Hutchison placed more than 17,300 square yards of sod in accordance with the specifications, and that the office engineer of Amon and Whitney approved the sod as placed. Judgment should be entered for the principal amount sued for, plus interest from the date of entry of final judgment in the lower court and costs.

This action was instituted by petition for attachment. After King's property was attached, he appeared generally and posted a forthcoming bond, with surety. An order will be entered here reversing the judgment of the trial court, entering final judgment for the plaintiff in the amount of $4,106.80, plus interest from June 12, 1964 and costs, and remanding the case for such further proceedings as may be appropriate.

*Reversed, final judgment and remanded.*