**Richmond**

CHANTILLY CONSTRUCTION CORP.

v.

DEPARTMENT OF HIGHWAYS & TRANSPORTATION

No. 0449-86-2

Decided May 17, 1988

COUNSEL

Channing J. Martin (Walter H. Ryland; Williams, Mullen & Christian, P.C., on briefs), for appellant.

James F. Hayes, Assistant Attorney General (Mary Sue Terry, Attorney General; Walter A. McFarlane, Deputy Attorney General, on brief), for appellee.

OPINION

**BENTON J.** — Chantilly Construction Corporation (Chantilly) contracted with the Virginia Department of Highways and Transportation (the Department) to repair interstate highways in Fairfax County. Chantilly sued the Department pursuant to Code § 33.1-387, alleging that Chantilly suffered damages due to construction delays which occurred because the Department supplied Chantilly with defective specifications and because the Department used flawed testing procedures to determine whether Chantilly was meeting specification requirements. At the conclusion of Chantilly's evidence, the trial judge granted the Department's motion to strike the evidence and dismissed the case. Chantilly contends that the trial judge erred in granting the motion to strike the evidence.[1] For the reasons which follow, we reverse the trial judge's order and remand the case for further consideration.

■ When a trial judge considers a motion to strike the evidence, "the plaintiff is entitled to have the evidence, and all reasonable inferences therefrom, viewed in the light most favorable to [the plaintiff], as upon a demurrer to the evidence." *Surface v. Johnson*, 215 Va. 777, 778, 214 S.E.2d 152, 153 (1975). Viewed in that light, the evidence establishes that on July 22, 1981, the Department contracted with Chantilly to repair portions of interstate highways in Fairfax County. The contract incorporated by reference the Department's 1978 Road and Bridge Specifications and other special provisions detailing supplemental specifications, techniques, and materials that the Department required Chantilly to use in patching the highways. One of the special provisions required Chantilly to use "Type III modified cement" in the concrete mixture. The provision further specified that Chantilly not use more than 800 pounds of Type III modified cement per cubic yard and limited to a maximum of two percent any calcium chloride used as an accelerating admixture. The specifications also required that the concrete achieve a minimum compressive strength

---

[1] Chantilly filed protective appeals in the Supreme Court of Virginia and in this Court. "Finding a lack of jurisdiction," the Supreme Court dismissed the petition for appeal. *Chantilly Construction Corp. v. Commonwealth of Virginia, etc., et al*, Record No. 860563 (unpublished order, April 30, 1987). *See also Commonwealth v. Yeatts, Inc.*, 233 Va. 17, 24, 353 S.E.2d 717, 721 (1987)(civil actions against the Department of Highways pursuant to Code § 33.1-387 are administrative appeals for purposes of Code § 17-116.05.1, the Court of Appeal's appellate jurisdiction statute).

of 3,000 psi within twenty-four hours.

Chantilly was required to submit the concrete mix design to the Department prior to commencement of work and to prepare trial slabs of concrete in the presence of the Department's engineer to verify strength and workability of the mix design. The provisions also specified that, unless approved by the Department's engineer, Chantilly was not to pour the concrete when the concrete's temperature was lower than seventy degrees Fahrenheit and the air temperature was lower than fifty-five degrees Fahrenheit. After the concrete was poured, the special provision required that the patch be cured with wet burlap or wet sand for at least four hours. Chantilly was notified by the Department to proceed with construction on August 24, 1981. The contract allowed Chantilly ninety days thereafter to complete the job.

After a concrete testing lab formulated the mix design, Chantilly prepared trial slabs of concrete in the presence of Roger Riner, the engineer assigned by the Department. Chantilly poured the first trial slabs of concrete in Chantilly's yard on September 22, 1981, and cured it according to specifications. After curing, Riner and other Department employees removed core samples and tested them for strength. The core samples failed to meet the 3,000 psi requirement. Riner and Chantilly believed this failure could have been caused by the slabs being cooled by water from the core drill.

Chantilly poured the second trial slabs on September 26, 1981. The core samples from these concrete slabs tested at average strengths of approximately 3500 psi. Riner approved this mix for use on the highway. After Chantilly poured concrete from this mix on the highway, core samples again were taken for further testing on September 29 and 30, 1981. The core samples did not reach the minimum standards, yielding average core strengths of 2747 psi on September 29 and 2580 psi on September 30.[2] Riner contacted the Department's central office for assistance in solving the problem. He testified that someone from the central office told

---

[2] The Department did not record air temperatures on the first day of testing. On the second day, the temperature reached a high of eighty-one degrees Fahrenheit, and dropped to an overnight low of fifty-four degrees Fahrenheit. Although the specifications limited the pouring of concrete during specific air temperature ranges, they did not address the air temperature range during the twenty-four hour curing period.

him that the Type III modified cement "might be the problem." The Department ordered tests performed "for general information."

Chantilly adjusted the mix by increasing the amount of a hardening agent in the mix and poured four more trial slabs of concrete. The low temperature during the twenty-four hour curing period was forty-five degrees Fahrenheit. Although not required by the specifications, Chantilly cured two of the trial slabs with insulating blanket covers to determine whether that would assist in retaining the heat and making the concrete attain the required strength. The average psi of the core samples cured with insulating blankets was 3088 and the average psi of the others was 2813. The Department did not accept the mix. Riner testified that he then suspected that the type of cement might be the problem.

Riner thereafter determined through statistical analysis that in order consistently to achieve a mix which would withstand 3000 psi on the highway, the average results of the test mix must be at least 4000 psi in twenty-four hours. Chantilly and Riner further adjusted the mix by adding the maximum permitted amount of calcium chloride to the maximum permitted amount of cement. Air temperatures during pouring ranged from sixty-two degrees Fahrenheit to ninety-six degrees Fahrenheit. The cores did not yield twenty-four hour strengths of 4000 psi, and the Department did not permit Chantilly to use the mix on the highway.

Chantilly and Riner again varied the mix and poured two more slabs on October 6, 1981. Test results improved somewhat, and Riner approved this mix even though the best test results achieved only 3600 psi, less than the 4000 psi Riner had previously found necessary to achieve a consistent 3000 psi on the highway. Chantilly patched the highway with the approved mix on October 12 and 13, 1981. Riner did not record the low temperature on those nights. Although not required by the contract, Chantilly heated the water and aggregate components of the concrete to determine whether added heat would contribute to strength gain. Nonetheless, the concrete failed to meet strength requirements, and the Department stopped further construction.

In a further attempt to remedy the problem, Chantilly requested the Department to supply it with test and design information that served as a basis for the contract specifications.

Chantilly's request was routed to Riner, who responded to his supervisors that the "test data on which the project special provision was based is not readily available to this office." The Department then supplied Chantilly with the test data recorded for Chantilly's various failed attempts to meet the Department's strength requirements, but not with any background tests or design information that had been used to set the contract specification standards. Shortly thereafter, Riner received a one-page test report from the Department in response to his request for tests and design information. The test report indicated that the testing had been done with Type III cement, not with the Type III modified cement required by the contract specifications. Riner testified that when he saw Type III cement on the test report, it "rang bells" for him. He also testified that he had thought more test data should have been available for the specification but that after additional attempts to obtain data, he got the impression that "nobody really knew where it was."

On November 20, 1981, Chantilly sent the Department a notice of intent to claim damages resulting from the alleged defective specifications. In a subsequent letter requesting a meeting with Department officials, Chantilly alleged that the specifications upon which it had relied as being reasonably and adequately designed and tested were in fact experimental in nature. Additionally, Chantilly stated that it wished to discuss the core sample testing procedure. In a meeting on December 16, 1981, John Lert, Chantilly's outside concrete consultant, informed the Department that Type III modified cement would not work because, among other problems, one of the Department's specifications limited the amount of tricalcium aluminate in Type III modified cement to eight percent. He stated that this limitation would not allow the cement to generate sufficient heat necessary during the hydration period to achieve the required strength within expected curing temperatures.

Riner testified that after the Chantilly representatives left the meeting, the Department's representatives decided that its position would be that the specifications were not defective but that the Department would be prepared readily to approve a new specification using Type III cement if the contractor proposed such specification. At trial, Chantilly's counsel asked Riner:

Q. And they didn't want to say to the contractor, we have decided you're right, go do it this way. Because if they did that, would be an admission that Type III modified was an error in the specifications, isn't that what you got the feeling of, right?

A. That is what I got some feeling of, yes, sir.

Chantilly was also under contract with the Department to repair highways in the Norfolk area and had experienced similar problems there in attaining the required strength using Type III modified cement. Although Chantilly apparently did not know it at that time, the Department's Research Council had prepared a memorandum on September 15, 1981, stating the following concern regarding concrete failures in the Norfolk area:

The relatively low average strength . . . may be the result of the inadvertent specification of Type III Modified Cement rather than the regular Type III we used in the experimental work last year. Depending upon the particular Type III Modified used, it may not be capable of quite as rapid strength development as the Type III. It is also true that most of the work to date has not included the optional calcium chloride accelerator.

On March 12, 1982, Chantilly and the Department held a meeting to discuss the upcoming construction season for highway repairs in Norfolk. The Department's district engineer stated at this meeting that the Department was willing to review and accept a change in the concrete mix.

On March 30, 1982, Chantilly wrote the Department, requesting that the Department allow a change from Type III modified cement to Type III cement in both the Norfolk and Fairfax projects. On May 4, 1982, the Department wrote to Chantilly approving the change, stating that "[w]e have no objection to the use of Type III cement in lieu of Type III modified. However, we still feel that satisfactory strength results can be achieved with Type III modified cement." Chantilly commenced construction using the Type III modified cement on August 2, 1982 and completed the job on November 17, 1982.

Chantilly's evidence at trial also included expert testimony from Eugene Hill, Jr., a chemical engineering consultant in concrete material problems. Hill testified that he was familiar with Type III modified cement and had previously supervised plants that manufactured this cement. In his opinion, the Department's specifications were "flawed," "experimental" and not "adequately tested before . . . put out for contract." He stated that Type III modified cement was an inappropriate type of cement for the project and that the limitation of 800 pounds of cement per cubic yard was inappropriate. Hill noted that the contract specifications limit of eight percent tricalcium aluminate "imposed a very significant limit on the rate at which the concrete could gain strength." Hill further noted that the contract specifications placed a further constraint on the rate of strength gain by placing limitations on the degree of fineness of the cement.

Based on his review of Department documents, Hill testified that the Department's test data showed that Type III cement was thirty to fifty percent higher in strength than Type III modified cement. He further testified that the Department, in conjunction with the Virginia Research Council, had performed experimental work on Type III cement and had developed the specifications in issue which were planned to be put out for bid first in the Norfolk area. Hill testified that one of the later drafts of the specifications, however, required Type III modified instead of Type III cement. Hill also testified that an intradepartmental memorandum comparing the experimental mix design with the mix design required by the specifications did not note among the listed differences that Type III modified cement was to be used instead of Type III cement. Hill opined that this memorandum implied that the Department "completely overlooked that they were changing the type cement."

Hill also testified that in addition to the specifications being flawed, the low psi's of the core samples could have been attributed to violations of the Department's specifications by Riner when he tested the core samples. Hill stated that deviations from standard procedures could vary test results significantly. In his opinion, Riner's practices of using a brick saw to cut the ends of the core samples, of failing to permit capping material to cool for at least two hours before testing, of using a machine that applied the load on the cores by hand rather than by power, of using card-

board as a capping material, and of reusing capping material, could have caused the psi results to appear lower than they actually were.

At the close of Chantilly's evidence, the Department moved to strike the evidence. In sustaining the Department's motion to strike, the trial judge's order stated:

> Upon consideration I find that plaintiff failed to establish which party was at fault for stopping work on the construction project. I further find, in view of the contract language in Road and Bridge Specifications, Section 200.01, page 90, 1978 edition, that the burden is on the contractor if he wants to substitute or convince the Highway Department to change contract specifications. The contractor did not meet this burden.

We conclude that the trial judge improperly viewed the plaintiff's evidence and that he erred in his interpretation of Section 200.01.

In *Jerrell v. Norfolk & Portsmouth Belt Line R.R. Co.*, 162 Va. 450, 174 S.E. 658 (1934), the court stated:

> "Where material facts and circumstances of a case lie peculiarly within the knowledge of the defendant, or peculiarly within the knowledge of both the plaintiff and the defendant, it is a *very* drastic proceeding to strike out all the plaintiff's evidence on a motion made at the conclusion of plaintiff's evidence in chief, before the defendant has testified. A motion to strike out made under such circumstances should not be sustained unless it is *very* plain that the court would be compelled to set aside a verdict for the plaintiff upon a consideration of the evidence strictly as upon a demurrer to the evidence."

*Id.* at 452, 174 S.E. at 659 (quoting *Jones v. Hambury*, 158 Va. 842, 846, 164 S.E. 545, 546 (1932))(emphasis in original). In *Williams v. Vaughan*, 214 Va. 307, 199 S.E.2d 515 (1973), the court reaffirmed this doctrine, stating:

> When the sufficiency of a plaintiff's evidence is challenged by a motion to strike, the trial court should resolve any reasonable doubt as to the sufficiency of the evidence in plaintiff's

favor and should grant the motion only when "it is conclu-
sively apparent that plaintiff has proven no cause of action
against defendant," or when "it plainly appears that the trial
court would be compelled to set aside any verdict found for
the plaintiff as being without evidence to support it."

*Id.* at 309, 199 S.E.2d at 517(citations omitted); *see also DHA,
Inc. v. Leydig*, 231 Va. 138, 140, 340 S.E.2d 831, 832 (1986).

Viewed in the light most favorable to Chantilly, the plaintiff
below, *Surface*, 215 Va. at 778, 214 S.E.2d at 153, abundant evi-
dence establishes that the specifications were defective and that
the Department used flawed procedures to test the concrete. The
delay was a direct consequence of those problems. The record
shows that Chantilly was unable to attain the required strength in
the concrete, despite the fact that Chantilly worked closely with a
Department engineer and made numerous attempts to modify the
mix and curing techniques within the parameters of the specifica-
tions. Chantilly produced Department documents indicating that
the Department's own test data showed that Type III cement was
thirty to fifty percent stronger than Type III modified cement. In
addition, according to Lert's report and Hill's testimony, the De-
partment's specifications were defective because they required
Type III modified cement. Both experts concurred that the cement
failed to generate sufficient heat to achieve the required strength
because the specifications limited the amount of tricalcium
aluminate.

Chantilly produced further evidence that the specifications were
defective because of an inadvertent error in listing Type III modi-
fied cement in the specifications instead of Type III cement. The
documents established that the testing for the specifications had
been performed on Type III cement, not Type III modified ce-
ment. Chantilly's evidence also included an intradepartmental
memorandum admitting that similar problems on the construction
in Norfolk "may be the result of the inadvertent specification of
Type III Modified Cement rather than the regular Type III we
used in the experimental work last year."

Not only did Chantilly produce clearly sufficient evidence that
the specifications were defective and resulted in the delay, it also
produced evidence that the Department's rejection of the mix de-
signs contributed to the delay and may have been the result of the

inappropriate testing methods. Hill, Chantilly's expert, cited several violations of the Department's own testing procedures by Riner and opined that those violations could have caused an inaccurate measurement of the concrete's strength.

 As a general rule, if a contractor " 'agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered.' " *Southgate v. Sanford and Brooks Co.*, 147 Va. 554, 563, 137 S.E. 485, 487 (1927)(quoting *United States v. Spearin*, 248 U.S. 132, 136 (1918)). If, however, the contractor is bound to build according to

> specifications furnished by the owner which have proved defective or insufficient [the contractor] will not be responsible to the owner for loss or damage which results solely from the defective or insufficient . . . specifications in the absence of negligence on the contractor's part, or any express guarantee or warranty by him as to their being sufficient or free from defects.

*Worley Bros. Co. v. Marus Marble & Tile Co.*, 209 Va. 136, 142, 161 S.E.2d 796, 801 (1968)(quoting *Greater Richmond Civic Recreation, Inc. v. A. H. Ewing's Sons, Inc.*, 200 Va. 593, 595, 106 S.E.2d 595, 597 (1959))(emphasis in original omitted).

The Department supplied Chantilly with specifications prescribing the types and amounts of components for the concrete mixture, the temperature ranges during pouring of the cement, and the methods by which the concrete was to be made. In so doing the Department impliedly warranted that those specifications, if complied with, would produce concrete that would meet strength requirements. *See Spearin*, 248 U.S. at 137. Absent special circumstance, it was Chantilly's "duty to follow the . . . specifications furnished as [its] guide" by the Department. *Southgate*, 147 Va. at 562, 137 S.E. at 487 (quoting *Adams v. Tri-City Amusement Co.*, 124 Va. 473, 476, 98 S.E. 647, 648 (1919)).

In granting the motion to strike the evidence, the trial judge, however, held that Section 200.01 in effect relieved the Department of any responsibility for the consequences of defects in the specifications and testing. While the general rule requiring an owner to bear the burden of loss for defective specifications may

be altered contractually, *see Greater Richmond Civic Recreation, Inc.*, 200 Va. at 595-96, 106 S.E.2d at 597, we cannot find in Section 200.01 an agreement by Chantilly to bear this burden. Section 200.01 states in pertinent part:

> If, *for any reason*, the Contractor desires to substitute another material for that specified or called for on the plans, he shall submit with his request for approval of the substitution, documentary proof that the material he proposes to substitute is equal in all respects to that specified or called for on the plans. Such proof shall preferably be in the form of specifications for the proposed substitution which may be readily compared with the original specifications.

(emphasis added). The trial judge, by necessary implication from his ruling, determined that the words "for any reason" included defective contract specifications and that Chantilly, in accordance with the rest of this provision, had the burden to propose new specifications that were not defective. While we agree that a strict interpretation of "any reason" might encompass defective contract specifications, we conclude that the trial judge's construction of Section 200.01 as imposing a burden on Chantilly to correct defective specifications was incorrect for several reasons.

"[A]ll of the provisions of a contract should be construed together and those which appear to conflict should be harmonized whenever it is reasonably possible." *Seward v. American Hardware Co.*, 161 Va. 610, 626, 171 S.E. 650, 659 (1933); *see also Berry v. Klinger*, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983); *Tiffany v. Tiffany*, 1 Va. App. 11, 16, 332 S.E.2d 796, 799 (1985). When the contract is read as a whole, the trial judge's interpretation of Section 200.01 is in direct conflict with Section 105.05 of the incorporated specifications. Section 105.05 states in pertinent part:

> The Contractor shall take no advantage of any apparent error or omission in the plans and specifications. In the event the Contractor discovers such an error or omission, he shall immediately notify the Engineer. The Engineer will then make such corrections and interpretations as may be deemed necessary for fulfilling the intent of the plans and specifications.

This provision, unlike Section 200.01, clearly places the burden on the Department to correct defective specifications. The trial court's construction of the contract ignored both the ambiguity raised by its interpretation of Section 200.01 and the clear import of Section 105.05.

■ "Where provisions of an instrument appear to be mutually conflicting, the provisions should be reconciled where . . . reasonable basis for reconciliation is afforded by the language of the instrument." *Hutchison v. King*, 206 Va. 619, 624-25, 145 S.E.2d 216, 220 (1965). In reconciling these two provisions, any apparent inconsistency between a clause that is general and broadly inclusive in character, and a clause that is more specific in character, should be resolved in favor of the latter. *See Mutual Life Ins. Co. v. Hill*, 193 U.S. 551, 558 (1904). Section 200.01, which states that the burden is on the contractor to substitute materials if he desires to change them "for any reason," must yield to Section 105.05, which speaks directly to the event of substitution of defective specifications. Section 105.05 directly places the burden to correct defective specifications on the Department.

Moreover, this interpretation appears to be the only reasonable and just construction of the contract. *See Dart Drug Corp. v. Nicholakos*, 221 Va. 989, 993-94, 277 S.E.2d 155, 157-58 (1981). Even in the absence of any conflict with Section 105.05, the trial judge's construction of the general phrase "for any reason" in Section 200.01 to mean that Chantilly had the burden to change defective specifications is a strained and unreasonable construction. When read in its entirety, Section 200.01 addresses situations where the substitutions are for the contractor's benefit. Thus, in situations where the materials listed in the specifications were no longer available or were more expensive than comparable materials, the contractor would have the burden of initiating such substitutions and proving they were "equal in all respects" to those he agreed to provide.

On the other hand, only an unreasonable and illogical reading of Section 200.01 places the burden on the contractor to initiate substitutions and to prove those substitutions are "equal in all respects" when the substitutions are necessitated because the Department supplied the contractor with defective specifications. This interpretation would put the contractor "at the mercy" of the owner and, therefore, is an interpretation to be avoided. *Pettibone*

*Wood Manufacturing Co. v. Pioneer Construction Co.*, 203 Va. 152, 157, 122 S.E.2d 885, 889 (1961).

While the contractor could have contracted to bear such a burden, in the absence of evidence of additional consideration for this undertaking or specific contractual language, we will not find such an agreement. Courts have been reticent to find that generally worded contract provisions place the burden of defective specifications on the contractor. *See Spearin*, 248 U.S. at 137 (clauses requiring builders to visit the site, to check the plans, and to assume responsibility for the work until completion and acceptance did not overcome implied warranty that specifications were not defective); *Greater Richmond Civic Recreation, Inc.*, 200 Va. at 595-96, 106 S.E.2d at 596-97 (clause guaranteeing material, equipment, and workmanship was sufficiently ambiguous as to present a jury question whether contractor was liable in event specifications defective); *Southgate*, 147 Va. at 563-65, 137 S.E. at 487-88(clauses requiring contractor to visit the premises, to take its own soundings, and to assume all responsibility for conditions in connection with the prosecution of the work did not relieve owner of liability for defective specifications).

We, therefore, conclude (1) that the evidence attributing the construction delay to defective specifications was sufficient to survive the Department's motion to strike, and (2) that the trial judge erred in construing the contract as placing the burden on Chantilly to correct defective specifications. Accordingly, we reverse the judgment of the trial court and remand this case for further proceedings consistent with this opinion.

*Reversed and remanded.*

Moon, J., and Hodges, J., concurred.