COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges O'Brien, Ortiz and Lorish
Argued at Fredericksburg, Virginia


PRUDENCE HOLMAN WATERS,
  INDIVIDUALLY AND AS TRUSTEE OF THE
  JANE C. HOLMAN TRUST, ET AL.
                                                    MEMORANDUM OPINION* BY
v.      Record No. 1223-23-4                        JUDGE LISA M. LORISH
                                                    APRIL 15, 2025
MEREDITH H. LEWIS, AS TRUSTEE OF THE
  CHRISTOPHER C. HOLMAN TRUST U/A
  SEPTEMBER 13, 2007, ET AL.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Michael F. Devine, Judge

John C. Monica, Jr. (Caroline L. Callahan; Offit Kurman, P.C., on
briefs), for appellants.

Nicholas J. Gehrig (John E. Coffey; Redmon, Peyton & Braswell,
LLP, on brief), for appellees.


In this appeal, several family members dispute their respective membership interests in

Holman Property, LLC, a company set up by the Jane C. Holman Trust to manage a real estate

interest. Everyone agrees that the trust advanced money to Chris, one of Jane's three children,

and that a later distribution agreement intended to true up that debt. But they disagree about

whether the distribution agreement made up the difference by reducing Chris's share of monthly

distributions, or by reducing his overall ownership interest in the underlying real estate interest.

The trial court concluded that the distribution agreement was an unambiguous contract that did

not change the ownership interests in the LLC and merely redistributed monthly rental income

from the property to repay Chris's debt. Interpreting the agreement, the court determined that

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

the debt would be fully repaid by April 30, 2026 and granted declaratory judgment for Meredith Lewis, who represents the Christopher Holman estate.

We affirm in part and reverse and remand in part. We agree that the distribution agreement did not change the ownership interests in the LLC because, even if the agreement intended to revise the ownership of the LLC, it could not have done so under the LLC's operating agreement. Thus, we affirm this holding. But we disagree that the terms of the distribution agreement unambiguously project that Chris's debt would be fully repaid by April 30, 2026. Instead, we find that the agreement is ambiguous as to the treatment of his debt. Accordingly, we reverse and remand this portion of the trial court's ruling for reconsideration in light of any parol evidence the parties present.

BACKGROUND

*The Two Holman Trusts and the Merrifield Property*

John and Jane Holman collectively owned a 50% undivided interest in 16 acres of real property located in Fairfax County ("the Merrifield property"). John and Jane created two trusts—the John D. Holman Trust and the Jane C. Holman Trust—and transferred their respective 25% interests in the Merrifield property to the trusts. John and Jane Holman had three children: Prudence, Chris, and William. Each child was an equal beneficiary of each trust such that each child had a one-third interest in each trust. Prudence was the trustee of both trusts.

William and Chris both had children who took interests in the trusts after they passed away in 2009 and 2014, respectively. William's interest went to his three children: Claire, Grace, and John II. They each received equal shares of William's one-third interest in each trust.

Chris created the Christopher C. Holman Trust to hold his interest in John and Jane's trusts; his five children, one of whom is Meredith Lewis, held equal interests in this new trust.[1]

Underlying the dispute in this appeal, the Jane C. Holman Trust advanced Chris an amount of money that, with interest, approximated $717,000 by 2012.

*The Holman Property LLC and its Operating Agreement*

In July 2012, Jane Holman died.[2] A few months later, Prudence, acting as trustee for both trusts, transferred the Merrifield property ownership interests to Holman Property, LLC. According to the operating agreement for the LLC, the company's purpose was to "own, manage, and otherwise deal with [the Merrifield property]." The LLC owned what had been John and Jane Holman's 50% interest in the Merrifield property, and John and Jane's trusts each owned 50% of the LLC, so each trust had a 25% interest in the property. The operating agreement identified Prudence, in her capacity as trustee of both John and Jane's trusts, as the only named member of the LLC. Under the designation of "member," the operating agreement also included "any person or entity admitted as an additional or a successor Member under this Agreement." Prudence also acted as the manager of the LLC.

The operating agreement set out the rules for assigning or transferring a member's interest in the LLC. Generally, a member must provide written notice to the LLC of any intended transfer of their ownership interest and offer to sell the interest to the company before assigning or transferring it. The agreement provided that "no Proposed Transferee shall become a Member of the Company except upon the written consent of all non-assigning Members." To transfer an interest to a trust beneficiary, the rules were slightly different. The member was "not

---

[1] For ease, we continue to refer to the interests ultimately passed on to the children of Chris and William after their deaths as Chris's and William's interests.

[2] John predeceased Jane in 2004.

required to offer to sell" the interest to the company prior to "transferring the Member's Interest" to "[t]he beneficiary of a trust for which the Member is a trustee, in accordance with the provisions of such trust," or to the "Member's ancestors or the Member's descendants," or to "a trust the sole beneficiaries of which" are the member's ancestors or descendants—so long as the transfer occurred through "*inter vivos* gift or testamentary or intestate succession." This provision clarified that "[n]otwithstanding the foregoing provisions, no Proposed Transferee shall become a Member of the Company except upon the written consent of all non-assigning Members."

The operating agreement also provided that "Net Income, Net Loss and tax credits shall be allocated among the Members in proportion to their respective Interests." Similarly, "[a]ll Funds Available for Distribution shall be allocated among the Members in proportion to their respective interests and may be distributed at such time as the Manager shall determine."[3] An interest is defined as "[t]he ownership interest of a Member in the Company." Finally, the operating agreement provided that it "may be amended by written instrument signed by all of the Members."

In summary, the beneficiaries of the John D. and Jane C. Holman Trusts were not identified by name as members when the LLC was created. Instead, the members of the LLC were the two trusts, through their trustee, Prudence. Each trust owned the LLC in equal shares, and, as contemplated by the operating agreement, the income generated from renting the Merrifield property would be distributed by the LLC to the trusts and paid out to the trust beneficiaries according to their respective interests in the trusts.

---

[3] Funds available for distribution constitute "[t]he sum of Capital Contributions, proceeds of loans to the Company, net sales proceeds, and operating cash flow, reduced by reserves reasonably necessary to provide for replacements, contingencies, improvements, and anticipated obligations, and further reduced by reasonable working capital reserve."

A week after signing the operating agreement, Prudence, as trustee of the John D. Holman Family Trust, assigned that trust's 50% membership interest in the LLC directly to its beneficiaries: Prudence (16.6667%), Chris (16.666%), and William's three children (each of whom received a 5.5556% interest). The assignment to William's three children was divided: one-third went directly to Claire Holman, while the other two portions for Grace and John II were assigned to their mother, Sara Holman, for their benefit. The Jane C. Holman Trust did not assign its 50% interest in the LLC.

It is undisputed that, by the end of 2012, Prudence, Chris, and William's heirs each were entitled to one-third of the distributions from the LLC. Half of those distributions (the ones originally stemming from the John D. Holman Family Trust) flowed directly to them as members of the LLC.[4] The other half flowed to the Jane C. Holman Trust to then be distributed to the beneficiaries of that trust.

*The Distribution Agreement*

In August 2013, Prudence, both as trustee of the Jane C. Holman Trust and in her individual capacity, Chris (through Meredith Lewis as his attorney-in-fact), and William's children (by Sara Holman as trustee), signed a "Distribution Agreement." The agreement was intended to "administer[] and distribute[]" "as a single pool of assets" Jane's trust and other assets at death. The total pool of assets included the Merrifield property, along with several other properties and two stock accounts. The distribution agreement also identified "certain known and fixed liabilities," which included "certain advances made to Chris by the Trust inclusive of accrued interest in the approximate amount of $717,000," which was labeled "Chris' Debt." Liabilities also included a mortgage, a $17,500 debt from William, and several other items.

---

[4] Or, in the case of William's children, to Sara Holman.

The fifth paragraph of the distribution agreement addressed the real property held by the Jane C. Holman Trust. That paragraph explained that "[t]he parties wish to retain the Merrifield property and distribute it as more fully described in Exhibit C." The heading "Plan of Distribution" appeared under Exhibit C. Under the subheading "Net Estate To Be Distributed" were listed the percentage of proceeds each party would receive from each piece of real property and the "estimated values" of the property according to the designated percentage. In referencing the properties that were to be sold, which were the "Aspen Lane" property and the "Columbus Street Property," the exhibit stated that William and Sara Holman's children, Chris, and Prudence would each "receive one-third of net proceeds" of the properties.[5] The agreement also stated that William and Sara Holman's children would receive "38% of Merrifield" "or" $2,703,000 "in the form of a monthly payment of $10,443" and that "Chris would receive 24% of Merrifield" "or" $1,269,000 "in the form of a monthly payment of $6,674." Finally, "Pru[dence] would receive 38% of Merrifield" "or" $2,703,000 "in the form of a monthly payment of $10,443." The exhibit concluded by stating that "[t]he revised ownership percentages of Merrifield will require an amendment to the existing Holman Family LLC." It added that "[t]he Merrifield rental payments are based upon 2013 rent levels, but are subject to an annual 3% escalator. Accordingly, the monthly rents will be adjusted in 2014 and beyond." Finally, the agreement provided that Exhibit C "represents estimated values and the percentages shown shall be binding upon the parties . . . even though the cash amounts may not be accurate."

---

[5] The agreement provided that William and Sara's children and Chris "would receive one-third of net proceeds of Columbus Street Property," while Prudence "would receive one-third of Columbus Street Property." The difference in language, that Prudence received "one-third of Columbus" while the other two LLC members received one-third of the "net proceeds" of Columbus, does not appear to be significant because each receives the same amount of $160,000, which amounts to $480,000 when multiplied by three—the value of the property according to Exhibit A of the agreement. Thus, even though the agreement gave Prudence "one-third of Columbus" instead of the proceeds of Columbus, the most natural reading of the agreement is to give Prudence one-third of the net proceeds of Columbus.

*Procedural History*

On November 24, 2021, Meredith Lewis, as trustee of the Christopher C. Holman Trust, and derivatively on behalf of Holman Property, LLC, filed a complaint in the Fairfax County Circuit Court against Prudence (individually and in her capacity as trustee of the Jane C. Holman Trust), Sara Holman, Claire Holman, Grace Holman, John D. Holman, and the Holman Property, LLC. She filed an amended complaint in December against the same parties.

The amended complaint alleged that the distribution agreement set up a plan for the Christopher C. Holman Trust to repay the debt through reduced monthly distributions but did not change ownership interests in the LLC. The complaint alleged that this was the interpretation reflected in the LLC's tax statements from 2013 to 2019, all of which identified the Christopher C. Holman Trust's ownership interest in the LLC as 33.33%. The complaint also alleged, however, that in 2020 Prudence hired a new accountant to prepare the LLC's tax returns and that, thereafter, Chris's ownership interest in the LLC was improperly reduced to 24% with corresponding increases to the interests held by Prudence and the children of William and Sara.

The complaint claimed a right to several forms of relief. Relevant to this appeal, Meredith sought a declaratory judgment to determine the ownership and distribution rights of the members of the LLC and "restor[e] the LLC members to their respective positions prior to this dispute."

At trial, the parties argued that the distribution agreement was unambiguous. During argument on the claim for declaratory relief,[6] Meredith asserted that the distribution agreement only dealt with the proceeds or income flowing to the LLC from the Merrifield property, and not

---

[6] The court granted Prudence's motion to strike all of Meredith's claims except for her request for declaratory relief as to the ownership interests and rights of the parties pursuant to the distribution agreement. The court dismissed the claim for breach of fiduciary duty, breach of the relevant contracts, and the request to reform the distribution agreement. The court also struck the request for a declaratory judgment that Prudence violated the operating agreement.

with the ownership of the asset. Supporting this position is the title of the document—"Distribution Agreement"—meaning that it "clearly deals with the repayment of . . . the Chris debt" and that the distribution agreement was expressly tied to the lease on the Merrifield property, bolstering the notion that the agreement only reallocated rental income from Merrifield and did not impact ownership percentages. Meredith also pointed out that the distribution agreement says that an amendment will be required to implement "revised ownership percentages," but there was never an amendment. Finally, she argued that the distribution agreement's language dividing "Merrifield," and not the "LLC," into percentages, was telling. The agreement could not be dividing the ownership of "Merrifield" among the children because the property was owned by the LLC, and the agreement did not divide up ownership of the LLC because it did not even mention the LLC. According to Meredith, this supported her theory that the agreement intended to distribute funds "related to" that asset, rather than carve up its ownership.

Prudence argued that the distribution agreement had effected a change of ownership in the shares of the LLC, pointing to Exhibit C's language distributing the "property" and not "income from" the property. She also asserted that if the agreement were merely dealing with the repayment of a debt, it lacked critical information like the period of time for which the distribution to the Christopher C. Holman Trust would be modified to complete repayment. As for the title of the agreement, she argued that the parties used the words "distribution agreement" because the agreement "deals with many things" in Jane Holman's estate, such as the distribution of the proceeds of other assets to be sold. Finally, Prudence pointed out the property valuations listed in the agreement and argued that the reduction in ownership percentage was a close match for Chris's debt and that the parties' intent was only solidified by the agreement's language about "revised ownership percentages."

In interpreting the distribution agreement, the court said it would disregard parol evidence because the parties did not argue that the contract was ambiguous. The court found that the purposes of the agreement were to distribute Jane's assets and to restore $717,000 to the trust to account for the advances to Chris Holman. Because Chris was a one-third beneficiary under the trust, the court concluded that he effectively owed only two-thirds of that amount to the trust, or $478,000. The agreement accounted for the debt by reducing the amount of the rental income he would have received from the Merrifield property as a one-third owner and offsetting it to Prudence and William's children. The court calculated that it would take about 178 months, or 15 years, of reduced rental distributions to pay off this amount, which made sense to the court considering that the Merrifield lease was signed in 2013 and expires in 2026.[7] Finally, considering that the language of the agreement says that Merrifield is going to be "retained" and that the agreement does not "say a peep about selling that property," the court asked why "Chris [would] give up any [ownership] share of the Merrifield property, in addition to the rents that he's giving up."

For these reasons, the court ruled in Meredith's favor, concluding that "[t]he [d]istribution [a]greement does not modify the ownership interest in and to the Holman Property LLC" and that it "only affects the amount of distributions to which the owners of Holman Property LLC are entitled through April 30, 2026." According to the final order, "By virtue of the foregoing distributions through April 30, 2026, the Chris Debt of $717,000 referenced in the [d]istribution [a]greement will be fully satisfied."

Prudence appeals.

---

[7] Details about the Merrifield lease were not included in the distribution agreement and instead came from parol evidence that was admitted at trial as relevant to the other causes of action that were ultimately dismissed.

ANALYSIS

Prudence assigns error to the circuit court's interpretation of the distribution agreement as affecting only distributions, and not ownership interests, in the Holman Property, LLC, and the court's conclusion that the $717,000 debt would be fully satisfied on April 30, 2026.[8] "[H]ow to interpret a contract presents a question of law that we review de novo." *CSE, Inc. v. Kibby Welding, LLC*, 77 Va. App. 795, 802 (2023). "We do not accord any deference to the circuit court's interpretation of the [agreements] 'because we are afforded the same opportunity as the circuit court to interpret the terms of the parties' contract.'" *Landmark HHH, LLC v. Gi Hwa Park*, 277 Va. 50, 55 (2009) (quoting *Pocahontas Mining L.L.C. v. CNX Gas Co., LLC*, 276 Va. 346, 352 (2008)).

The rules of contract interpretation are well-settled. We construe contracts "'as written' and do 'not add terms the parties themselves did not include.'" *PBM Nutritionals, LLC v. Lexington Ins. Co.*, 283 Va. 624, 636 (2012) (quoting *Landmark HHH, LLC*, 277 Va. at 57). "[W]hen the terms of a contract are clear and unambiguous, a court must give them their plain meaning." *Landmark HHH, LLC*, 277 Va. at 55 (quoting *Levisa Coal Co. v. Consolidation Coal Co.*, 276 Va. 44, 57 (2008)). "The guiding light . . . is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Golding v. Floyd*, 261 Va. 190, 192 (2001) (alteration in original) (quoting *Magann Corp. v. Elec. Works*, 203 Va. 259, 264 (1962)). Therefore, "if the intent of the parties can be determined from the language they employ in their contract, parol

---

[8] Prudence also argues that the court erred because Meredith did not meet the evidentiary burden necessary to obtain the declaratory judgment issued by the court. But because Prudence failed to raise this argument below, or develop it in her briefing, it is waived. Rule 5A:18; Rule 5A:20.

evidence respecting their intent is inadmissible." *Id.* at 192-93 (citing *Amos v. Coffey*, 228 Va. 88, 91-92 (1984)).

   A. *The distribution agreement did not alter membership interests in the LLC.*

The threshold question is whether the distribution agreement changed the parties' ownership percentages in the LLC from 33% each to 38%, 38%, and 24%. Prudence contends that "when Chris signed the [d]istribution [a]greement, his debt [of $717,000] was immediately settled by virtue of a 9% reduction in his LLC ownership percentage which was transferred to the other LLC members." In contrast, Meredith argues that the distribution agreement instead reduced Chris's monthly distributions of income from the Merrifield property and that "the portions he gave up would be distributed to the other members of the LLC until his debt was repaid." We conclude that the distribution agreement did not change the ownership percentages of the LLC, regardless of whether it intended to effect such a change. Because Jane's trust continues to be the relevant member of the LLC, the agreement would have had to first effect a change in the trust's membership interests before effecting a change to the LLC's ownership.

The LLC's operating agreement restricts the transfer of membership interests in the LLC.[9] Membership interests can be sold if the LLC is first given notice and the opportunity to buy the interest. Membership interests can also be passed to beneficiaries of Jane's trust or to "[t]he beneficiary of a trust for which the Member is a trustee, in accordance with the provisions of such trust," or to the "Member's ancestors or the Member's descendants," or to "a trust the sole beneficiaries of which" are the member's ancestors or descendants. The agreement also permits a member to devise his or her interest through a will and for an interest to be passed

---

[9] In construing the LLC operating agreement, we do not suggest that the operating agreement and distribution agreement together constitute one contract. Instead, because the distribution agreement references the operating agreement, we must interpret the operating agreement's membership rules to assess the impact of the distribution agreement on the operation of the LLC, if any.

through the rules of intestacy. Any other transfer requires "the written consent of all non-assigning Members."

Contrary to what Prudence argues, the distribution agreement was not itself "written consent of all non-assigning Members" that could successfully amend the operating agreement. Instead, the distribution agreement states that "revised ownership percentages of Merrifield will require an *amendment* to the existing Holman Family LLC." (Emphasis added). That is the only mention of the LLC in the agreement whose primary purpose was to administer and distribute identified assets.[10] The evidence presented at trial was that no separate amendment ever took place.

We therefore hold that the distribution agreement could not modify the LLC's ownership interest, even if it intended to do so. As it stands, then, the Jane C. Holman Trust continues to own 50% of the membership interests in Holman Property, LLC and continues to make each of the three siblings (and their heirs following their deaths) equal one-third beneficiaries. The trial court was correct to conclude that the distribution agreement "does not modify the ownership interest in and to the Holman Property LLC."

> B. *Because the distribution agreement is ambiguous, the trial court should have considered parol evidence in determining how the agreement accounted for repayment of Chris Holman's debt.*

Determining that the distribution agreement did not change the LLC's ownership percentages does not end our inquiry. After finding that each member retained their original one-third interest, the trial court then found that the agreement set up a repayment scheme under

---

[10] We also express some doubt about whether all "non-assigning Members" could be said to have signed the agreement. The John D. Holman Trust directly assigned its interests in the LLC to Prudence, Christopher Holman, and William Holman's three children. Sara Holman signed as trustee to accept those assignments on behalf of two of her and William's children, Grace Holman and John Holman, II, but the third child, Claire Holman, received the membership interest directly. William's children did not sign the distribution agreement as members of the LLC, though Sara Holman purported to sign the agreement as trustee for all three children.

- 12 -

which the $717,000 debt attributed to the Christopher C. Holman Trust would be repaid through reduced monthly distributions and satisfied as of April 30, 2026. The court reached this conclusion after agreeing with the parties that the contract was unambiguous and excluding any parol evidence in interpreting it. Prudence argues that the court erred in interpreting the distribution agreement to provide for this repayment plan.

Determining whether the distribution agreement is ambiguous is an important threshold question. If an agreement is ambiguous, parol evidence is admissible. But if the agreement is unambiguous, a reviewing court is limited to the four corners of the agreement. *Landmark HHH, LLC*, 277 Va. at 55 (quoting *Levisa Coal Co.*, 276 Va. at 57). An ambiguous contract is one that "may be understood in more than one way" or "may be construed to refer to two or more things at the same time." *Nextel WIP Lease Corp. v. Saunders*, 276 Va. 509, 516 (2008); *see also Westmoreland-LG&E Partners v. Va. Elec. & Power Co.*, 254 Va. 1, 12 (1997) (Where "neither party has offered a construction . . . that could be deemed so clear that it unambiguously excludes the explanation offered by the opponent," parol evidence is admissible. (quoting *Cascades N. Venture Ltd. P'ship v. PRC Inc.*, 249 Va. 574, 582 (1995))). On the other hand, "[w]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself . . . because the writing is the repository of the final agreement of the parties." *Va. Elec. & Power Co. v. N. Va. Reg'l Park Auth.*, 270 Va. 309, 316 (2005) (quoting *Berry v. Klinger*, 225 Va. 201, 208 (1983)).

Whether a contract is ambiguous is a question of law, so "the trial court's conclusions in this regard are not binding on this Court." *Langman v. Alumni Ass'n of the Univ. of Va.*, 247 Va. 491, 498 (1994). For this reason, we must assess for ourselves whether the distribution agreement is complete on its face and plain in its meaning, or whether it may be understood in more than one way. To answer this question, we rely on well-established canons of construction.

For example, "all of the provisions of a contract should be construed together," rather than in isolation. *Jennings v. Jennings*, 12 Va. App. 1187, 1194 (1991) (quoting *Chantilly Constr. Corp. v. Dep't of Highways & Transp.*, 6 Va. App. 282, 293 (1988)). Additionally, "when two provisions of a contract appear to be mutually conflicting, they should be reconciled if a reasonable basis for reconciliation is afforded by the instrument's language." *First Am. Bank v. J.S.C. Concrete Constr., Inc.*, 259 Va. 60, 69 (2000). Finally, a word in the contract should not be considered meaningless "if a reasonable meaning can be given to it" because "there is a presumption that the parties have not used words needlessly." *Westmoreland-LG&E Partners*, 254 Va. at 11 (quoting *D.C. McClain, Inc. v. Arlington Cnty.*, 249 Va. 131, 135-36 (1995)).

We find that the distribution agreement is ambiguous as to how the parties intended to resolve the $717,000 debt, $478,000 of which Chris needed to repay. The LLC's operating agreement ties a member's income from the property to their ownership interest in the LLC. In other words, since the distribution agreement could not have changed Chris's 33.33% interest in the Jane C. Holman Trust, or the trust's 50% interest in the LLC, the court concluded it effectively set up a repayment plan under which Chris voluntarily agreed to have a portion of his distribution through the trust withheld and redistributed to the other beneficiaries. Even though the distribution agreement could not legally change the equity Chris had in Merrifield, for the reasons described above, parts of the agreement suggest that was the intention. Afterall, the agreement references "revised ownership percentages of Merrifield" and states that Chris would "receive 24% of Merrifield." This later phrase contrasts with how the agreement treats Chris's entitlement to other assets ("Chris would receive one-third of *net proceeds* . . . ." (emphasis added)). But using the approximate property valuations in Exhibit A of the distribution agreement, reducing Chris's equity in Merrifield (valued at $5,242,000) from 33.33% to 24% amounts to $490,169, which exceeds the $478,000 Chris needed to repay. And as the trial court

- 14 -

pointed out, having Chris lose equity in addition to the ongoing reduction in monthly distributions would be akin to Chris repaying the debt twice.

On the other hand, the distribution agreement also seems to support Meredith's contention that the intent was to redistribute the existing lease payments such that Chris would receive less money each month to repay the debt. The agreement states that Chris would receive 24% of Merrifield "in the form of a monthly payment of $6,674," whereas the other heirs would receive "monthly payment[s] of $10,443." But the distribution agreement lacks critical information about when Chris's reduced monthly payments would end and whether the debt would continue to accrue interest during repayment. And while the agreement references an annual rental payment escalator for the lease on the Merrifield property, the agreement is silent as to the term of that lease and what happens if the lease is terminated.

In short, the distribution agreement is simply ambiguous. It can be read more than one way. And that means that the trial court should have considered all relevant parol evidence before concluding that Chris's debt would be fully repaid by April 30, 2026. In fact, it appears that the trial court did consider at least some parol evidence in selecting the April 30, 2026 date because (as the court noted on the record) it corresponds to when the existing lease on Merrifield would end.[11] Nothing on the face of the distribution agreement leads to this conclusion.[12]

---

[11] The lease agreement was introduced at trial in support of Meredith's other claims. It shows that the initial lease term ended in 2016 with the option for the tenant to renew the lease for up to two consecutive terms of five years. Rental payments during the initial term are subject to the escalator described in the distribution agreement, but rental payments during renewal terms were to be based on a determination of market rate with another 3% escalator that applied to that amount.

[12] The trial court performed some back-of-the-envelope calculations based on the reduction Chris received in monthly reductions in an effort to support the April 30, 2026 date, but appeared to erroneously use $448,000 as the amount Chris needed to true up, instead of $478,000, and did not consider the 3% escalator.

This litigation began after the LLC's accountant adjusted the ownership percentages in relevant tax documents in 2020, seven years after the distribution agreement was signed. As a result, Prudence sought declaratory relief on whether the distribution agreement had in fact adjusted the ownership percentages in the LLC. As we explained above, it did not. Prudence also requested any other and further relief deemed necessary by the court, and after concluding the distribution agreement did not impact ownership of the LLC, the court deemed it necessary to interpret the agreement. Because the agreement was ambiguous, however, the court should have considered relevant parol evidence. While some parol evidence was admitted at trial because it was relevant to other (later dismissed) counts, on remand, the court should consider any additional relevant evidence in interpreting the agreement.[13]

## CONCLUSION

For these reasons, we affirm the court's conclusion that the distribution agreement did not alter the membership of the Holman Property, LLC, but we reverse and remand the court's conclusion that the distribution agreement unambiguously states that Chris's debt would be fully repaid by April 30, 2026.

*Affirmed in part, and reversed and remanded in part.*

---

[13] Some of the other parol evidence received for other purposes included correspondence between Prudence and the LLC's accountants suggesting portions of the distribution agreement had erroneously used the valuations of the Merrifield property based on the full 50% share originally owned by John and Jane Holman, instead of only the 25% share transferred to the Holman Property, LLC from the Jane C. Holman Trust. Because the original request for declaratory relief was limited to whether the distribution agreement altered ownership interests in the LLC, and the court proceeded to determine when the repayment schedule would end as part of other necessary relief it deemed appropriate, we do not fault the parties for not initially attempting to introduce all potential relevant evidence related to when repayment would end under the agreement.